UNITED STATES OF AMERICA
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.

JOEL RUFUS FRENCH

CASE NO. 8: 24 cr 156 TB - N H A

18 U.S.C. § 371
18 U.S.C. § 1349
18 U.S.C. § 1956(h)

**INDICTMENT**     SEALED

The Grand Jury charges:

A.    **Introduction**

At times material to this Indictment:

The Conspirators and their Entities

1.    The defendant, JOEL RUFUS FRENCH, resided in Amory, Mississippi.

2.    FRENCH owned and operated R & L Marketing Inc., dba R & L Marketing Group LLC ("R & L"), a purported marketing company located in Amory, Mississippi.

3.    Durable medical equipment ("DME") was reusable medical equipment such as orthotic devices, walkers, canes, or hospital beds. Orthotic devices were a type of DME that included knee braces, back braces, shoulder braces, and wrist braces (collectively, "braces").

4.    Embrace of Clearwater Inc. ("Embrace") was a DME company located in Clearwater, Florida, in the Middle District of Florida.

1

5.     Perfect Motion Medical, LLC ("Perfect Motion") was a DME company located in Holiday, Florida, in the Middle District of Florida.

6.     Cherry Medical Supply, Inc ("Cherry") was a DME company located in Chattanooga, Tennessee.

7.     Helpful Home Medical Supply, Inc. ("Helpful Home") was a DME company located in Miami Beach, Florida.

8.     Integrity Medical Supply, Inc. ("Integrity") was a DME company located in Cape Girardeau, Missouri.

9.     M & M Medical, LLC ("M&M") was a DME company located in Conyers, Georgia.

10.    Paradise Medical Solutions, Inc. ("Paradise") was a DME company located in Miami Gardens, Florida.

11.    Radiance Health Group, Inc. ("Radiance") was a DME company located in Cape Girardeau, Missouri.

12.    FRENCH managed Embrace, Perfect Motion, Cherry, Helpful Home, Integrity, M&M, Paradise, and Radiance.

13.    "Leads" consisted of patient data and recordings of calls with consumers, who were mainly Medicare beneficiaries. During the calls, representatives at call centers typically inquired about consumers' Medicare eligibility and their interest in receiving a brace or braces. The representatives harvested this information along with beneficiaries' personally identifiable

2

information ("PII") to build the "leads," which then were converted into brace orders.

14. Conspirator Steven Parker, a resident of Texas, owned and operated Unique Media Connections, dba Media Lead Kings ("UMC"), which was located in Addison, Texas.

15. UMC was a "broker" company that would purchase and resell doctors' orders for DME from "marketers."

16. CP Bracing Supply, Inc. ("CP Bracing") was a DME company located in Largo, Florida, in the Middle District of Florida.

The Medicare Program

17. The Medicare Program ("Medicare") was a federal health insurance program that provided medical benefits, items, and services to beneficiaries:

a. aged 65 and older,

b. under 65 with certain disabilities, and

c. of all ages with end-stage renal disease (permanent kidney failure requiring dialysis or a kidney transplant).

18. The Centers for Medicare and Medicaid Services ("CMS") was an agency of the U.S. Department of Health and Human Services ("HHS"), and was the federal government body responsible for the administration of Medicare.

19. Medicare covered different types of benefits that were separated into different program parts. Medicare Part B covered, among other things, doctors'

3

services, outpatient care, and certain medical equipment, such as DME, that was medically necessary.

DME Claims Submitted under Medicare Part B

20.    DME companies, physicians, and other health care providers that provided services to Medicare beneficiaries were referred to as "providers." To participate in Medicare, providers were required to submit an application in which the providers agreed to comply with all Medicare-related laws, rules, and regulations. If Medicare approved a provider's application, Medicare assigned the provider a Medicare "provider number." A health care provider with a Medicare provider number could file claims with Medicare to obtain reimbursement for medically necessary items and services rendered to beneficiaries. Medicare providers were given access to Medicare manuals and service bulletins describing billing procedures, rules, and regulations.

21.    Medicare reimbursed DME providers and other health care providers for medically necessary items and services rendered to beneficiaries. To receive payment from Medicare, providers submitted or caused the submission of claims to Medicare, either directly or through a billing company.

22.    A Medicare claim for DME reimbursement was required to set forth, among other information, the beneficiary's name and unique Medicare identification number, the equipment provided to the beneficiary, the date the equipment was provided, the cost of the equipment, and the name and unique physician identification number of the physician who prescribed or ordered the equipment.

4

23.    Medicare would pay a claim for the provision of DME only if the equipment was medically necessary, ordered by a licensed provider, and actually provided to the beneficiary. Medicare claims were required to be properly documented in accordance with Medicare rules and regulations. Medicare would not reimburse providers for claims that were procured through the payment of kickbacks and bribes.

CHAMPVA

24.    The Civilian Health and Medical Program of the Department of Veterans Affairs ("CHAMPVA") was a federal health benefit program. CHAMPVA was a comprehensive health care program in which the VA shared the cost of covered health care services and supplies with eligible beneficiaries. CHAMPVA beneficiaries included the spouses or children of veterans who had been rated permanently and totally disabled for a service-connected disability and the surviving spouses or children of veterans who had died from VA-rated service-connected disabilities. In general, the CHAMPVA program covered most health care services and supplies that were medically necessary. CHAMPVA was always the secondary payer to Medicare and reimbursed beneficiaries for costs that Medicare did not cover. Health care claims must have first been sent to Medicare for processing. Medicare electronically forwarded claims to CHAMPVA after Medicare had processed them. For Medicare supplemental plans, CHAMPVA processed the remaining portion of the claim after receiving Medicare's explanation of benefits.

## COUNT ONE
## (Conspiracy)

### A.    Introduction

25.    The allegations contained in Paragraphs 1 through 3 and 13 through 24 of the Indictment are re-alleged and incorporated by reference as though fully set forth herein.

### B.    Conspiracy

26.    From at least in or around August 2017, and continuing through in or around April 2019, in the Middle District of Florida and elsewhere, the defendant,

JOEL RUFUS FRENCH,

did knowingly and willfully combine, conspire, confederate, and agree with Parker and other persons, known and unknown to the Grand Jury, to:

a. defraud the United States out of money and property and by impeding, impairing, obstructing, and defeating the lawful function of HHS, through its agency CMS, in the administration of Medicare Part B, by deceit, craft, and trickery; and

b. commit the following offenses against the United States:

i. soliciting and receiving remuneration, in violation of 42 U.S.C. § 1320a-7b(b)(1); and

ii. offering and paying remuneration, in violation of 42 U.S.C. § 1320a-7b(b)(2).

### C.    Manner and Means of the Conspiracy

27.    The manner and means by which the defendant and his conspirators sought to accomplish the objects of the conspiracy included, among others, the following:

6

a.     It was part of the conspiracy that the conspirators would and did target beneficiaries of federal health care benefit programs, including Medicare, for the purpose of procuring doctors' orders for DME.

b.     It was further part of the conspiracy that conspirators at call centers would and did speak with beneficiaries to obtain the PII necessary to generate leads, which were used to generate doctors' orders.

c.     It was further part of the conspiracy that FRENCH would and did pay kickbacks and bribes to obtain medical providers' signatures on doctors' orders.

d.     It was further part of the conspiracy that FRENCH would and did sell doctors' orders to his conspirators, including Parker, in exchange for kickbacks and bribes.

e.     It was further part of the conspiracy that FRENCH and his conspirators would and did disguise the nature and source of these kickbacks and bribes by entering into sham contracts and using sham invoices that falsely identified the payments as for legitimate services, when, in reality, the owners of the DME companies paid FRENCH a set amount per brace contained in each doctor's order.

f.     It was further part of the conspiracy that FRENCH would and did sell doctors' orders to Parker through UMC.

g.     It was further part of the conspiracy that Parker would and did resell the doctors' orders to DME companies, including those in Pinellas County, Florida.

h.    It was further part of the conspiracy that the conspirators would and did use the doctors' orders for DME to submit and cause to be submitted false and fictitious claims for payment to Medicare on behalf of the DME companies, including those in Pinellas County.

i.    It was further part of the conspiracy that the conspirators would and did cause Medicare to pay the DME companies in Pinellas County approximately $37 million as a result of claims submitted for braces using the doctors' orders sold by FRENCH.

j.    It was further part of the conspiracy that the conspirators would and did perform acts, and make statements to promote and achieve the scheme and artifice and to misrepresent, hide, and conceal, and cause to be misrepresented, hidden, and concealed, the purpose of the scheme and artifice and the acts committed in furtherance thereof.

### D.    Overt Acts

28.    In furtherance of the conspiracy, and to accomplish its purposes and objects, the defendant,

JOEL RUFUS FRENCH,

together with others known and unknown to the Grand Jury, committed and caused others to commit at least one of the following overt acts, among others, in the Middle District of Florida and elsewhere:

a.    In or around April 2019, FRENCH sold doctors' orders to Parker.

8

b.    On or about April 5, 2019, Parker resold the doctors' orders he purchased from FRENCH to CP Bracing, a DME company located in Pinellas County, for approximately $160,000.00, orders which were used to submit false and fraudulent DME claims to Medicare.

c.    On or about April 8, 2019, Parker made a payment of $657,350.00 to FRENCH, through R & L, in exchange for those doctors' orders.

d.    On or about the dates set forth below, each of which constitutes a separate overt act, CP Bracing used doctors' orders that Parker purchased from FRENCH and resold to submit false and fraudulent DME claims to Medicare and to cause the shipment of at least one brace to the Middle District of Florida:

| Overt Act | On or About Date Submitted | Beneficiary Initials | Approximate Amount Billed |
|---|---|---|---|
| c.1 | April 8, 2019 | R.H. | $1,388.09 |
| c.2 | April 8, 2019 | R.F. | $1,061.13 |
| c.3 | April 9, 2019 | Q.H. | $1,061.13 |

All in violation of 18 U.S.C. § 371.

9

## COUNT TWO
### (Conspiracy to Commit Health Care Fraud and Wire Fraud)

### A.    Introduction

29.    The allegations contained in Paragraphs 1 through 24 of the Indictment are re-alleged and incorporated by reference as though fully set forth herein.

### B.    Conspiracy

30.    From in or around January 2018, and continuing through in or around April 2019, in the Middle District of Florida and elsewhere, the defendant,

JOEL RUFUS FRENCH,

did knowingly and willfully combine, conspire, confederate, and agree with others, to commit health care fraud, in violation of 18 U.S.C. § 1347, and to commit wire fraud, in violation of 18 U.S.C. § 1343.

### C.    Manner and Means of the Conspiracy

31.    The manner and means by which the defendant and his conspirators sought to accomplish the purposes of the conspiracy included, among others, the following:

a.    It was part of the conspiracy that the conspirators would and did target beneficiaries of federal health care benefit programs, including Medicare, for the purpose of procuring doctors' orders for DME.

b.    It was further part of the conspiracy that conspirators would and did conceal from Medicare and others, the true control and management of the DME companies.

c.    It was further part of the conspiracy that FRENCH would and did sell doctors' orders to his conspirators in exchange for kickbacks and bribes.

d.    It was further part of the conspiracy that the conspirators would and did cause the transmission of, by means of interstate wire communications, signed DME brace orders, which were secured through illegal kickbacks and bribes.

e.    It was further part of the conspiracy that FRENCH and his conspirators would and did cause the doctors' orders to be billed to Medicare.

f.    It was further part of the conspiracy that FRENCH and the conspirators would and did disguise the nature and source of these kickbacks and bribes by entering into sham contracts and using sham invoices that falsely identified the payments as for legitimate services, when in reality the owners of the DME companies paid FRENCH a set amount per brace contained in the doctor's order.

g.    It was further part of the conspiracy that FRENCH would and did manage and control Embrace, Perfect Motion, Cherry, Helpful Home, Integrity, M & M, Paradise, and Radiance.

h.    It was further a part of the conspiracy that FRENCH and conspirators would and did cause CMS 855S Forms to be submitted to Medicare that failed to disclose, or would and did fail to update previously filed CMS 855S Forms, on behalf of Embrace, Perfect Motion, Cherry, Helpful Home, Integrity, M&M, Paradise, and Radiance that FRENCH managed each of the DME companies. In reality, FRENCH was a manager of Embrace, Perfect Motion, Cherry, Helpful Home, Integrity, M&M, Paradise, and Radiance.

11

i.    It was further a part of the conspiracy that FRENCH and conspirators would and did cause the offering and payment of illegal kickbacks and bribes in exchange for arranging for medical providers to sign doctors' orders for DME regardless of medical necessity.

j.    It was further a part of the conspiracy that FRENCH and others would and did cause the submission of false and fraudulent claims to Medicare and CHAMPVA using doctors' orders that were procured through the payment of kickbacks and bribes, medically unnecessary, ineligible for reimbursement, and not provided as represented.

k.    It was further a part of the conspiracy that FRENCH would and did receive the majority of the profits from the reimbursement that the conspirators received from Medicare and CHAMPVA, as well as a fee per beneficiary.

l.    It was further a part of the conspiracy that, from in or around January 2018, and continuing through in or around April 2019, FRENCH and the conspirators would and did submit, and cause the submission of approximately $33,805,315.58 to Medicare and approximately $141,050.76 to CHAMPVA in false and fraudulent claims for braces, that were procured through the payment of kickbacks and bribes, medically unnecessary, ineligible for reimbursement, and not provided as represented.

m.    It was further a part of the conspiracy that, from in or around January 2018 to in or around April 2019, FRENCH and the conspirators would and

did cause Medicare to pay via interstate wires approximately $15,732,294.75 and CHAMPVA to pay approximately $23,082.06 on those false and fraudulent claims.

n.     It was further part of the conspiracy that the conspirators would and did perform acts, and make statements to promote and achieve the scheme and artifice and to misrepresent, hide, and conceal, and cause to be misrepresented, hidden, and concealed, the purpose of the scheme and artifice and the acts committed in furtherance thereof.

All in violation of 18 U.S.C. § 1349.

## COUNT THREE
### (Money Laundering)

### A.     Introduction

32.     The allegations contained in all prior Paragraphs of the Indictment are re-alleged and incorporated by reference as though fully set forth herein.

### B.     Conspiracy

33.     In or around April 2019, in the Middle District of Florida and elsewhere, the defendant,

JOEL RUFUS FRENCH,

did knowingly and willfully combine, conspire, and agree with others to commit offenses against the United States in violation of:

a.     18 U.S.C. § 1956 (a)(1)(B)(i), that is, to knowingly conduct a financial transaction affecting interstate commerce, which financial transaction involved the proceeds of specified unlawful activity, knowing that the property

13

involved in the financial transaction represented the proceeds of some form of unlawful activity, and with the intent to conceal the carrying on of the specified unlawful activity; and

b.      18 U.S.C. § 1957, that is, to knowingly engage and attempt to engage in a monetary transaction affecting interstate commerce, by, through, and to a financial institution, in criminally derived property of a value greater than $10,000, and such property having been derived from specific unlawful activity, knowing that the property involved in the monetary transaction was derived from some form of unlawful activity.

It is further alleged that the specified unlawful activity is conspiracy to commit health care fraud and wire fraud, in violation of 18 U.S.C. § 1349; conspiracy to defraud the United States and paying and receiving kickbacks, in violation of 18 U.S.C. § 371; and payment of kickbacks in connection with a federal health care program, in violation of 42 U.S.C. § 1320a-7b and 18 U.S.C. § 2.

## C.     Manner and Means of the Conspiracy

34.    The manner and means by which the defendant and his conspirators sought to accomplish the purposes of the conspiracy included, among others, the following:

a.      It was part of the conspiracy that on or about April 8, 2019, FRENCH withdrew more than $75,000 in cash from a bank in Mississippi.

b.      It was further a part of the conspiracy that FRENCH caused that money to be placed in a duffle bag and transported to the Middle District of Florida.

14

c.     It was further a part of the conspiracy that FRENCH caused that cash to be paid to his conspirators.

All in violation of 18 U.S.C. § 1956(h).

## FORFEITURE

1.     The allegations contained in Counts through Three of this Indictment are realleged and incorporated by reference for the purpose of alleging forfeitures pursuant to the provisions of 18 U.S.C. §§ 982(a)(1) and (7).

2.     Upon conviction for the violations alleged in Counts One and Two, the defendant shall forfeit to the United States of America, pursuant to 18 U.S.C. § 982(a)(7), any and all property, real or personal, that constitutes or is derived, directly or indirectly, from the gross proceeds traceable to the commission of the offenses.

3.     Upon conviction for the violation alleged in Count Three, the defendant shall forfeit to the United States of America, pursuant to 18 U.S.C. § 982(a)(1), any and all property, real or personal, involved in such offense, or property traceable to such property.

4.     The property to be forfeited includes, but is not limited to, an order of forfeiture in the amount of $39,867,665.78, which is the amount the defendant obtained as a result of the commission of the offenses charged in Counts One and Two, together with the following assets which constitute or were derived from proceeds of the offenses:

15

a. Approximately $3,000,000 transferred to Burr & Forman, LLC's client trust account from R&L Marketing on April 9, 2019.

b. Approximately $1,077.11 Bank of America account number 898091856161 in the name of Embrace of Clearwater, Inc.

c. Approximately $775.72 BancorpSouth Bank account number 77105039 in the name of Embrace of Clearwater, Inc.

d. Approximately $37,776.81 Renasant Bank account number 8015201802 in the name of J Lynn Medical Supplies.

e. Approximately $948,228.83 Pacific Life Insurance Company annuity contract/account number FX18009821, together with any accrued interest and/or appreciation to such contract/account in the name of Joel R. French.

f. Approximately $874,594.36 Athene Annuity and Life Company contract/account number AX00090776, together with any accrued interest and/or appreciation to such contract/account in the name of Joel R. French.

g. Approximately $53,402.40 Pacific Life Insurance Company annuity contract/account number FX18009821, together with any accrued interest and/or appreciation to such contract/account in the name of Joel R. French.

h. Approximately $50,617.68 Renasant Bank account number 291127306 in the name of Joel Rufus French and Letricia R. French.

i. Approximately $1,543.19 Bank of America account number 334048793335 in the name of Lateese Gamla Ford.

j. Approximately $3,000,000 transferred to Maple Harris, PLC's client trust account from R&L Marketing on April 9, 2020.

k. Approximately $22,389.00 BancorpSouth Bank account number 77105328 in the name of Patriot Medical Supplies, LLC.

l. Approximately $19,823.27 BancorpSouth Bank account number 77104529 in the name of R and L Laboratory Services, LLC.

m.  Approximately $794,878.12 Bancorp South's MoneyGram Account associated with the purchase of Official Check Numbers 0664002201 – 0664002203 in the name of R&L Marketing.

n.  Approximately $43,206.45 BancorpSouth Bank account number 77104669 in the name of R&L Senior Marketing.

o.  Approximately $14,324.84 BancorpSouth Bank account number 77105286 in the name of R&L Senior Marketing.

p.  Approximately $574,915.79 Renasant Bank account number 8011045792 in the name of R&L Senior Marketing.

q.  Approximately $1,000,000.00 Renasant Bank account number 8013303578 in the name of in the name of R&L Senior Marketing.

r.  Approximately $889,198.88 Renasant Bank account number 8011045792 in the name of R&L Senior Marketing.

s.  Approximately $5,629,101.93 Renasant Bank account number 8013303578 in the name of R&L Senior Marketing.

t.  Approximately $248,659.04 securing Renasant Bank Official Check number 10620830 in the name of Renasant Bank.

u.  Approximately $549,151.75 Renasant Bank account number 8012473402 in the name of Restorative Management, LLC.

5.  If any of the property described above, as a result of any act or omission of the defendant:

a.  cannot be located upon the exercise of due diligence;

b.  has been transferred or sold to, or deposited with, a third party;

c.  has been placed beyond the jurisdiction of the court;

d.  has been substantially diminished in value; or

17

  e.  has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property

under the provisions of 21 U.S.C. § 853(p), as incorporated by 18 U.S.C. § 982(b)(1).

A TRUE BILL,



FOREPERSON

ROGER B. HANDBERG
United States Attorney

By: _____
  Jennifer L. Peresie
  Assistant United States Attorney

By: _____
  Carlton C. Gammons
  Assistant United States Attorney
  Deputy Chief, Economic Crimes Section

By: _____
  Catherine E. Wagner
  Trial Attorney, Fraud Section, Criminal Division
  U.S. Department of Justice

By: _____
  Glenn S. Leon
  Chief, Fraud Section, Criminal Division
  U.S. Department of Justice

# UNITED STATES DISTRICT COURT
### Middle District of Florida
### Tampa Division

THE UNITED STATES OF AMERICA

vs.

JOEL RUFUS FRENCH

## INDICTMENT

Violations: 18 U.S.C. § 371
18 U.S.C. § 1349
18 U.S.C. § 1956(h)

A true bill,

███████████

Foreperson

Filed in open court this 4th day

of April 2024.

C. Neaues

Clerk

Bail $_____

GPO 863 525