**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION**

UNITED STATES OF AMERICA,
   Plaintiff,


                                  Case No. 8:24-cr-156-SJM-NHA

v.


JOEL RUFUS FRENCH,
   Defendant.
_____/

**DEFENDANT'S SENTENCING MEMORANDUM**

## I.    Introduction

In the final days of his father's life, Joel Rufus French was not thinking about sentencing guidelines or the outcome of this case. He was in Amory, Mississippi—at his father's bedside—helping care for the man who had raised him, just as he had done for years as his parents' health declined. When Magistrate Judge Adams granted him a brief furlough, he honored every condition, returned home, and did what he has done throughout his life: he showed up for his family when they needed him most.

Mr. French comes before the Court having been convicted of serious offenses after exercising his constitutional right to trial. Although he maintains the positions he took at trial, he recognizes that the Court must now impose a sentence consistent with the law and the factors set out in 18 U.S.C. § 3553(a) and that this Court must determine a sentence based on the jury's verdict and the full record.

But the measure of Mr. French as a man cannot be understood through loss figures or guidelines calculations addressing eighteen months of his nearly half-century of life. As discussed below, he has lived nearly all of that life in a small community where he is known by name—a

1

husband of more than twenty years, a father whose children remain deeply devoted to him, an uncle who helped raise a niece from infancy, and a son and son-in-law who has been a primary caregiver to aging parents and a mother-in-law through illness and decline. He has lived a life looking after people who need him, as many describe in the attached letters and as we discuss below. *See* Exs. 1–12.

Section 3553(a) requires the Court to impose a sentence "sufficient, but not greater than necessary" to serve the purposes of sentencing. The advisory guideline sentence here—life imprisonment, capped at 420 months—does not reflect that mandate. It is far outside the sentences federal courts actually impose on similarly situated defendants and on defendants in comparable DME and telemedicine fraud cases nationwide, as summarized in Exhibit 13, and it cannot be reconciled with the individualized assessment the statute requires.

For the reasons that follow, a sentence of 144 months' imprisonment is sufficient to reflect the seriousness of the offense, promote respect for the law, and provide just punishment. That sentence is serious, and it reflects the aggravating facts the Court must weigh. It also accounts for who Mr. French is—not only the conduct for which he stands convicted, but the life he has lived outside of it.

## II.    Procedural Background

On April 4, 2024, a federal grand jury returned a three-count indictment charging Mr. French with participating in a kickbacks conspiracy under 18 U.S.C. § 371 and 42 U.S.C. § 1320a-7b(b)(1) and (b)(2); conspiracy to commit healthcare fraud and wire fraud under 18 U.S.C. §§ 1343, 1347, and 1349; and conspiracy to commit money laundering under 18 U.S.C. § 1957. After his arrest, Mr. French was released on a $10,000 unsecured bond with pretrial supervision. He faithfully honored the conditions of his release.

He pleaded not guilty and elected to exercise his constitutional rights to trial and to testify in his own behalf. A jury ultimately returned a guilty verdict on all three counts. In deference to that verdict, Mr. French did not contest being remanded to custody pending sentencing. Doc. 163 at 10.

The United States Probation Office has calculated a total offense level of 43 and a Criminal History Category of I, yielding a guideline sentence of life imprisonment, capped at 420 months under USSG § 5G1.2(b). Although, as discussed in our objections to the PSR, the two-level sophisticated-means enhancement should not apply here, Mr. French acknowledges that the application of that enhancement does not affect his total offense level. In addition, although he stands by his trial testimony, challenges the credibility of the witnesses who refuted it, and contests the enhancements for obstruction of justice and for being a leader or organizer of the offense, he acknowledges that, if the Court credits the trial testimony, that testimony would support those enhancements.

For these reasons, Mr. French recognizes that his offense level is 43 and that his advisory guidelines sentence is 420 months. Still, Mr. French notes that the Court is not bound at sentencing by the jury's implicit credibility findings and may make its own independent determinations under the preponderance standard. *See United States v. Watts*, 519 U.S. 148, 156 (1997). And, even if any witness-credibility concerns are insufficient to defeat the proposed enhancements, those concerns bear on the weight the Court should give the underlying conduct in its section 3553(a) analysis.

In any event, the advisory guidelines are only the starting point. *Gall v. United States*, 552 U.S. 38, 49 (2007). The controlling question is whether a guidelines sentence would be reasonable here. For the following reasons, it would not.

III.     **Argument**

A.     **A sentence of 144 months satisfies Section 3553(a).**

Section 3553(a) requires the Court to impose a sentence that is "sufficient, but not greater than necessary" to satisfy the purposes of sentencing. In doing so, the Court must make an individualized assessment of the facts, *Gall*, 552 U.S. at 50, and may vary from the guidelines based on policy disagreement with them, *Kimbrough v. United States*, 552 U.S. 85, 101 (2007), or based on the section 3553(a) factors applied to the specific defendant, *United States v. Williams*, 472 F.3d 835, 841 (11th Cir. 2006).

Section 3553(a)(6), which is one of the factors *Gall* directs this Court to weigh, instructs the Court to avoid "unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." The Sentencing Commission's data, confirmed by recent sentences in directly comparable cases across the country, establishes two propositions: (1) a sentence at or near the 420-month cap would place Mr. French dramatically outside the observed national distribution; and (2) a sentence of 144 months would place him at its center.

i.     **The Sentencing Commission's own data identifies 144 months as the national median for defendants with Mr. French's profile.**

The Sentencing Commission's Judicial Sentencing Information tool ("JSIN") compiles nationwide sentencing data for defendants matching a specified profile. For the last five fiscal years (FY2021–2025), JSIN identifies 40 defendants whose primary guideline was USSG §2B1.1, with a final offense level of 43 and a Criminal History Category of I, after excluding defendants who received a USSG §5K1.1 substantial-assistance departure. *See* Ex. 14. That is Mr. French's profile exactly. For those 40 defendants, the mean sentence imposed was 167 months. The median—that is, the typical sentence imposed—was 144 months. *See id.*

At the sentencing of a somewhat similarly situated defendant in the Southern District of Florida, Gary Cox, the Department of Justice cited this same data (although for FY 2020–2024) as relevant to the section 3553(a)(6) analysis. *See* Ex. 15 at 9. The Commission's data reflects the accumulated judgment of federal district courts nationwide, across every circuit, over five years, applied to defendants whose guidelines recommend life imprisonment. That accumulated judgment rejects the proposition that defendants at this profile warrant sentences approaching the statutory maximum. A sentence of 144 months tracks the national median. A sentence approaching 420 months is grossly disproportionate to it.

### ii.    Recent sentences in directly comparable DME and telemedicine fraud cases confirm the pattern.

The JSIN data captures all section 2B1.1 offense-level-43 defendants, regardless of the specific underlying scheme. The sentences imposed in Operation Brace Yourself-era DME and telemedicine fraud confirm that the JSIN mean and median reflect the right range. A summary of those comparator sentences is set out in Exhibit 13. The chart reflects the same pattern: sentences for trial-convicted defendants in comparable cases cluster in the low-to-mid hundreds, with 144 months at the center of that distribution. Four defendants in that set warrant detailed discussion: Gary Cox, Leah and Michael Hagen, and Alexander Baldonado. Each went to trial. None received a section 5K1.1 departure. Each therefore stands in a procedural posture close to Mr. French's.[1]

**Gary Cox — 180 months.** Cox is the single most probative comparator. According to the government's sentencing memorandum in that case, Cox was the architect of a web-based platform

---

[1] The PSR identifies nine defendants whose cases the PSR describes as related to Mr. French's. PSR at 2–3. Each of those defendants entered a guilty plea, and each received some combination of USSG §3E1.1 acceptance credit and USSG §5K1.1 substantial-assistance credit. Of those defendants sentenced to date, the sentences range from 12 months and one day (Michelle Koehlinger) to 51 months (Kelly Wolfe). *See* Ex. 28.

the government described as "one of the most efficient mechanisms of defrauding Medicare that we've ever seen." Ex. 15 at 6; *see also* Ex. 16 at 8 (Cox sentencing transcript). Cox personally designed the platform's templates, engineered narrative randomization to defeat Medicare's audit-detection systems, embedded false language representing that physicians had performed physical knee examinations he knew could not have been performed by telephone, and limited the billing codes available to match whatever the downstream DME supplier wanted billed. Ex.15 at 3–4. His bald-faced scheme generated more than $1.062 billion in Medicare billings and more than $452 million in payouts—more than five times the intended loss attributed to Mr. French and more than four times the actual loss. *See* Ex. 16 at 38.

Cox was convicted after a five-week jury trial. His guidelines, like Mr. French's, recommended life imprisonment capped at the statutory maximum (720 months in Cox's case). Ex. 16 at 6. Yet the district court sentenced him to 180 months. Ex. 16 at 42. Granted, at the time of his sentencing, Cox was elderly and in poor health. Still, if Cox received 180 months for a billion-dollar scheme engineered to evade audit detection, a sentence of 420 months for Mr. French cannot be reconciled with section 3553(a)(6).

**Leah and Michael Hagen — 151 months each.** Like Mr. French, the Hagens were convicted of paying kickbacks to telemedicine and marketing entities for doctors' orders and then using those orders to bill Medicare for medically unnecessary orthotic braces. *See* Ex. 17. Their scheme billed Medicare approximately $59 million and resulted in Medicare payments exceeding $27 million. *Id.* They were convicted in Texas after an eight-day jury trial. *See id*. The district court sentenced each of them to 151 months' imprisonment. *See* Exs. 18, 19.

By its verdict, the jury here found that Mr. French owned or controlled DME companies that billed Medicare for fraudulent orders, which is the same conduct at issue with the Hagens.

6

According to the government's trial evidence, Mr. French's DME companies billed Medicare approximately $35 million, *see* PSR ¶ 23; Doc. 157 at 199, which is less than the Hagens' $59 million. And Mr. French's personal gain, according to the government, of $27 million is, by coincidence and to the dollar, approximately equal to the Hagens' $27 million in Medicare payments. *See* PSR ¶ 24. The principal difference in the loss figures is not that Mr. French operated more DMEs or billed more aggressively. It is that, in addition to billing through his own DMEs, Mr. French sold doctors' orders to others, whose downstream DME network billed Medicare an additional $162.8 million using those orders. *See* PSR ¶ 23; Doc. 159 at 234. Although that additional billing is reasonably attributed to Mr. French as relevant conduct, the Hagens are Mr. French's closest analogue. Mr. French's requested 144-month sentence sits a few months below the sentence imposed on each Hagen, which is the right calibration for a defendant whose direct principal-operator conduct tracks theirs.

**Alexander Baldonado — 84 months.** Baldonado was captured on undercover video accepting cash for signed brace prescriptions, ordered cancer genetic tests for elderly Medicare beneficiaries he had never met, and billed Medicare for lengthy office visits that never occurred. *See* Ex. 20. After a five-day jury trial in the District of New Jersey, Baldonado was convicted on ten counts and, on October 23, 2025, sentenced to 84 months' imprisonment. *See* Ex. 21. Although his $24 million loss amount is less than the intended loss attributed to Mr. French, his 84-month sentence sets a low-loss anchor for the trial-convicted Operation Brace Yourself defendants.

**The resulting benchmark.** Cox, the Hagens, and Baldonado frame a loss-calibrated framework: Cox at 180 months for a $1 billion scheme with purpose-built audit-evasion technology; the Hagens at 151 months each for a $59 million scheme operated by principal owners; and Baldonado at 84 months for a $24 million scheme. Mr. French controlled eight DME

7

companies that billed Medicare approximately $35 million; his $197.89 million intended loss is larger than the Hagens' because of downstream billings by a DME network using orders he sold, not greater directness in his own billing conduct. His requested sentence of 144 months tracks within a few months of the Hagens' 151 months, sits 36 months below Cox's 180 months (for a scheme five times the size), and is precisely the national median for defendants at his guideline profile. A 420-month sentence would punish Mr. French more harshly than Cox, the Hagens, Baldonado, and (as explained next) even Elizabeth Hernandez. That would not be a proportionate outcome.

### iii.    The sentence of Elizabeth Hernandez is an outlier driven by aggravators not present here.

One data point in the comparator set warrants further mention: *United States v. Hernandez*, No. 1:22-cr-20152-KMM (S.D. Fla.), in which the district court sentenced Elizabeth Hernandez to 240 months on December 21, 2023. *See* Ex. 22. The loss figures in that case are close to the losses attributed to Mr. French: intended loss of $192.08 million and actual loss of $111.26 million, compared to Mr. French's $197.89 million and $110.75 million. *See* Ex. 23.

But loss parity is not enough to require sentence parity. Hernandez is an outlier: 73 months above the JSIN mean, 96 months above the JSIN median, and 60 months above Cox's sentence for a defendant responsible for nearly three times Cox's loss. The right question is what drove her sentence so far above the observed national pattern. The sentencing memorandum filed in *Hernandez*, Ex. 23, identifies five specific aggravating factors, none of which are present here.

**First.** Hernandez was a licensed nurse practitioner. The government's memorandum placed her abuse of professional trust at the center of its argument, observing that "[w]ithout medical professionals like Hernandez willing to sell their signature, none of this fraud would be possible." Ex. 23 at 12. Mr. French held no professional license.

8

**Second.** Hernandez personally directed a friend to forge her signature, involving her own boyfriend and teenage son in the forgery; she also falsified patient medical records, fabricating injuries and pain histories. *Id.* at 6–7. Mr. French's record reflects no personal-fraud-in-the-trenches conduct of that character.

**Third.** Hernandez continued signing orders after the April 2019 Operation Brace Yourself takedown and generated $132 million in additional fraudulent Medicare billing after personally circulating the DOJ press release for Operation Double Helix. *Id.* at 11. Mr. French's offense conduct ceased in April 2019—the opposite of the specific-deterrence failure that drove Hernandez's sentence.

**Fourth.** Hernandez's obstruction extended well beyond challenged trial testimony: a sham contract mischaracterizing her compensation structure, plans to delete text messages, and a false police report claiming her NPI was stolen—caught on bodycam—while she continued performing telemedicine. *Id.* at 7–9. Here, Mr. French disputes the factual bases for the obstruction enhancement, including the allegation that he instructed Sushil Singh to destroy records, which is based purely on hearsay. *See* Doc. 159 at 185–86. But, even accepting that allegation arguendo, the single directive does not approach Hernandez's sustained, multi-layered obstruction of the investigation itself.

**Fifth.** Hernandez separately billed Medicare for telemedicine consultations she did not perform, "double-dipping" by billing Medicare for consultations involving the same patients whose signed orders generated downstream DME billings. Ex. 23 at 7, 9–10. Mr. French's conduct involved no such second stream of Medicare reimbursement.

These five factors, individually significant and collectively dispositive, help explain the 96-month gap between Hernandez's sentence and the JSIN median for her guideline profile. None

describes Mr. French. A sentence calibrated to Hernandez would extract from her case a proposition the record does not support—namely, that her 240-month sentence was driven by loss alone rather than by the particular combination of aggravators the government specifically argued to the district court.

### iv.    The appropriate anchor is the observed national pattern, not a single outlier.

Section 3553(a)(6) is a shield against disparity, not a sword for enhancement. A single outlier sentence is not the baseline against which disparities are measured; the observed pattern is. And the pattern here points decisively below 240 months: a JSIN mean of 167 months and median of 144 months across 40 comparable defendants nationwide; the Hagens at 151 months each following a trial conviction as principal operators; Cox at 180 months for a billion-dollar scheme; and Baldonado at 84 months at the low end of the distribution.

Mr. French's requested sentence of 144 months places him precisely at the median of the national cohort. It reflects the aggravating factors present in this case—organizer role, obstruction, trial posture, substantial loss—without treating those factors as warranting a sentence dramatically above the observed national pattern. A sentence of 144 months avoids unwarranted disparities. A sentence at or near the statutory cap would create them.

### C.    Under *Kimbrough*, Mr. French's Loss-Driven Guidelines Offense Level Should be Given Reduced Weight.

The section 2B1.1 loss table that drives Mr. French's guideline range produces a result—life imprisonment, capped at 420 months—that is not truly calibrated to his culpability. When, in a case such as this, a properly calculated guidelines range advises a sentence unmoored from empirical penological judgment, *Kimbrough* authorizes the Court to vary downward. 552 U.S. at 109–10; *see also Spears v. United States*, 555 U.S. 261, 264 (2009).

10

The section 2B1.1 loss table at the center of Mr. French's guideline was not developed through empirical study of fraud culpability. As the Honorable District Judge Underhill explained at length in his concurrence in *United States v. Corsey*, 723 F.3d 366, 379–80 (2d Cir. 2013), the fraud guideline's loss table has been amended upward three separate times in response to congressional directives without any intervening empirical study of actual fraud sentences. *Id.* at 380. "The history of bracket inflation directed by Congress renders the loss guideline fundamentally flawed, especially as loss amounts climb. The higher the loss amount, the more distorted is the guideline's advice to sentencing judges." *Id.*

That reasoning has found purchase by other authorities as well. *See, e.g., United States v. Musgrave,* 647 F. App'x 529, 538 (6th Cir. 2016) (citing *Corsey*, and Mark H. Allenbaugh, *"Drawn from Nowhere": A Review of the U.S. Sentencing Commission's White-Collar Sentencing Guidelines and Loss Data*, 26 Fed. Sent'g Rep. 19, 19 (2013)); *United States v. Cavera*, 550 F.3d 180, 192 (2d Cir. 2008) (en banc) (recognizing district courts' authority to vary from section 2B1.1 on policy grounds); *United States v. Algahaim*, 842 F.3d 796, 800 (2d Cir. 2016) ("Where the Commission has assigned a rather low base offense level to a crime and then increased it significantly by a loss enhancement, that combination of circumstances entitles a sentencing judge to consider a non-Guidelines sentence"). And the Sentencing Commission's own annual sentencing data reflects the practical response: across recent years, a substantial share of fraud-offense sentences, including healthcare-fraud offenses, have been imposed below the advisory range, reflecting the accumulated judgment of district courts that the loss-driven arithmetic routinely overstates the appropriate sentence in large-loss cases.[2]

---

[2] According to the U.S. Sentencing Commission's annual Sourcebook Table 32, in each of the last five fiscal years (FY 2021–2025), the majority of sentences imposed under section 2B1.1 were below the advisory guidelines range, even excluding cases with a section 5K1.1 substantial-

Apply the guideline here and the overstatement becomes plain. Mr. French's intended loss of $197.89 million triggers a 26-level enhancement under section 2B1.1(b)(1). Combined with the base offense level and the other enhancements, the calculated offense level exceeds 43, which produces a guidelines range of life, capped at 420 months by USSG §5G1.2(b). The guideline is essentially indifferent to the distinction between a $197 million loss and a $1 billion loss: both produce level 43 at criminal-history category I. Yet defendant Cox, discussed above, was sentenced to 180 months for five times the intended loss at issue here. Although the guidelines treat the two defendants identically, district courts applying section 3553(a) factors do not. That divergence is not a sign that the courts are wrong. It is evidence that the guideline's mechanical loss arithmetic is overstating the appropriate sentence at these loss magnitudes.

The enhancement structure compounds the problem. The PSR applies a 4-level organizer/leader enhancement under section 3B1.1(a), a 2-level sophisticated-means enhancement under section 2B1.1(b)(10)(C), and a two-level mass-marketing enhancement under section 2B1.1(b)(2)(A)(i) — eight levels, stacked, for essentially a single course of conduct. The factual predicates overlap. The call centers that the PSR cites as sophisticated-means features are the same call centers that supply the mass-marketing enhancement. The multi-layered business structure that the PSR cites as sophistication is the same structure that supports the organizer/leader enhancement. Each enhancement, in isolation, may be defensible on the trial record. But the three enhancements together use the same conduct—a large-scale DME telemarketing scheme involving multiple participants, call centers, and related corporate entities—to drive the offense level upward three separate times. For purposes of section 3553(a), the cumulation of overlapping enhancements

---

assistance departure. *See* Ex. 24. USSC QuickFacts further reports that, in FY 2024, 42.8 percent of healthcare fraud cases received a downward variance, with an average sentence reduction of 56.4 percent. *See* Ex. 25.

is one of the mechanisms by which the section 2B1.1 architecture produces a sentence that is unmoored from the incremental-culpability analysis that section 3553(a) requires. It is further basis for giving the advisory guideline reduced weight. *Cf. United States v. Lauersen*, 348 F.3d 329, 344 (2d Cir. 2003) (cumulative effect of overlapping enhancements warranted consideration of departure), *vacated on other grounds*, 543 U.S. 1097 (2005).

### D.    Section 3553(a)(1) — Mr. French's History And Characteristics Support The Requested Sentence.

Section 3553(a)(1) directs the Court to consider "the history and characteristics of the defendant." The accompanying letters describe a man who shows up for others, who is relied upon in ordinary and difficult moments alike, and who has been a reliable presence in his family and community. As the Vice-Mayor of Amory, who has known him for more than three decades, observed, he "always strives to help others personally and professionally." *See* Ex. 1.

Nothing in Mr. French's personal history describes the kind of cunning exhibited by some of the defendants in the comparable cases discussed above—one who created purpose-built systems to defeat audit detection; others who forged signatures and falsified records; and another who submitted a false report to police. The letters of his many supporters describe the opposite: a life lived in the open, in a small community where he is known by name, in roles defined by accountability to the people around him rather than concealment or distance from them. That is not, by itself, a defense to the conduct for which the jury convicted him. It is, however, relevant to the question section 3553(a) puts before the Court: not what the offense was, but who the defendant is.

**Family and community.** Mr. French was born and raised in Amory, Mississippi, a town of approximately 6800 people where three generations of his family still live. PSR ¶¶ 52–53. He grew up in the Church of the Living God, where his father served as pastor and his mother remains

13

a faithful member. *See* Ex. 2. He graduated from Amory High School in 1996 as the top-ranked

tight end prospect in the country, played for the University of Mississippi as a consensus All-

American, and left school for the National Football League. *See* Exs. 7, 8, 9; PSR ¶ 53. When his

mother fell ill and needed emergency surgery shortly after he signed as a free agent with the Seattle

Seahawks, he called the team and told them he would not be reporting; he went home to be with

her instead. *See* Ex. 8.

After injury ended his professional career, he returned to Amory, where he met and married

Letricia Stegall-French, his classmate since middle school, in 2004. PSR ¶ 54; Ex. 10. They have

been married for more than twenty years and have two children, Charleston and Kyra, now in

college. PSR ¶ 54. They have also raised Mr. French's niece, Irelyn Sky French, who came into

the family at five weeks old when her biological parents could not raise her; Mr. French, in his

early twenties, stepped into a parental role he has held ever since. *See* Ex. 5.

**A life of service.** The accompanying letters—from a sitting Mississippi Justice Court

judge, the Vice-Mayor of Amory, his high school football coach, a bishop of twenty-five years'

acquaintance, an NFL coach who has known him since 1994, his mother, his wife, his children,

and his siblings—all describe someone who looks after people, often at his own expense, and on

whom others have learned they can rely. *See* Exs. 1–12. That pattern begins early.

Out of his earliest NFL paychecks—earned at the league rookie minimum—Mr. French

and his wife began hosting an annual Senior Citizen Banquet in Amory, providing a Christmas

meal and gifts to elderly members of the community "whether we were doing good financially or

barely making it." Ex. 11. They kept that tradition going for twenty years. Exs. 10, 11. The list of

similar conduct runs long: a full renovation of his local church, holiday meals and toys for needy

families "without leaving one person gift-less," a youth-baseball assistant-coaching stint that

14

began when he walked up unsolicited as a teenager and asked to volunteer, a local Boys and Girls Club he started after coming home, and an open door to family members who needed one—including an uncle he took in when the uncle was declared homeless in 2018. Exs. 1–12.

What the letters return to, again and again, is not simply that Mr. French has helped others—it is that the people around him have come to count on him. He is described as the "pillar" of his family who "shows up without being asked," Ex. 4, and as someone widely respected across generations in his community, Ex. 3. Coach Bobby Hall, who has known the family since 1984 and who has spent forty years in public education, writes that he considers Mr. French "one of the finest young men I coached from a character and moral standpoint." Ex. 7. Joe Pannunzio, an NFL coach of forty-five years now with the Philadelphia Eagles, who has known Mr. French since 1994, calls him "a lover of people with a kind heart" whose "commitment to helping others" has been constant across three decades. Ex. 8. Social media posts from community members confirm this assessment. *See* Ex. 30.

In more recent years, his instinct to serve those in need has been directed toward caregiving. Mr. French has been a primary caregiver for his aging parents and his mother-in-law. Ex. 10. When his mother-in-law was hospitalized after a fall, he and Letricia brought her into their home rather than let her return to an empty house, and she has lived with them ever since. Ex. 10. When his mother was diagnosed with breast cancer at the start of the COVID-19 pandemic, he drove her forty-five minutes each way to Tupelo for thirty consecutive days of radiation, sitting through every session. *Id.* As his father's health failed—end-stage renal failure compounded by dementia—he managed the medical appointments, the medications, and his father's daily physical needs "with patience and dignity," Ex. 6, sometimes driving from one parent's appointment to the other's in the same day, Ex. 10. Through the grace of Magistrate Judge Adams, he was permitted

15

to be at his father's bedside in Amory when his father passed away on April 19, 2026. *See* Doc. 177.

**As a father.** The most direct measure of who Mr. French is comes from the three young people he helped raise. *See* Ex. 29. Kyra remembers her father running onto a soccer field to scoop up a crying six-year-old at her first game, driving four hours each way to Atlanta to exchange a pageant dress that arrived wrong two days before her competition, and never being the parent she had to scan the stands to find. Ex. 12. Charleston describes his father driving ten and a half hours through the night from Mississippi to North Carolina—after staying for one of Kyra's late-evening cheer events—to sit in the stands for a game Charleston, recovering from injury, was unlikely even to play in. Ex. 11.  Sky calls him, simply, "a gentle giant with an even gentler heart." Ex. 5. This is the man the Court is sentencing.

**Recent loss.** Mr. French's father, Joel French, passed away on April 19, 2026, after the filing of the PSR and before sentencing. Mr. French, who had been in custody since the February 2 verdict, moved for a brief furlough so that he could be with his father in his father's final days and attend the funeral. Magistrate Judge Adams granted the motion and released Mr. French on conditions that included home confinement with location monitoring, third-party custodianship, and an unsecured bond. *See* Doc. 177. Mr. French is on that furlough now, set to return to custody following the funeral. Judge Adams's justified faith in him—and Mr. French's full compliance with the conditions imposed—provides a concrete, recent measure of his history and characteristics under § 3553(a)(1).

**No prior criminal history.** Mr. French has no prior criminal history of any kind. PSR ¶¶ 45–51. His Criminal History Category of I reflects not just the absence of recent convictions but the absence of any meaningful criminal involvement across nearly five decades of life.

16

**Seven years under government scrutiny, without incident.** Beyond the absence of a prior record, the period since the charged offense conduct ended provides an unusually concrete measure of Mr. French's character. He has now lived under some form of active government scrutiny for nearly seven continuous years, and he has been flawless throughout. Mr. French learned in 2019 that he was under federal investigation, and, from that point forward, he made the affirmative choice to remain entirely outside the healthcare industry. Over the five years between the close of the offense conduct and his April 2024 arrest, he submitted no claims—to Medicare, CHAMPVA, or any other payor—and engaged in no further healthcare billing of any kind. After his arrest, he was released on a $10,000 unsecured bond and remained on pretrial supervision for nearly two years before trial; he honored every condition. After the February 2026 verdict, when his guidelines exposure was already understood to be life imprisonment, the Court released him on furlough so that he could be with his father in his final days and attend the funeral. *See* Doc. 177. Magistrate Judge Adams's willingness to grant that release on the conditions imposed constitutes a recent on-the-record judicial assessment of his risk profile under the most exacting circumstances. Section 3553(a)(1) asks who this defendant is. Seven years of compliance under federal scrutiny—investigative, supervisory, and custodial-release—is among the most reliable answers the record can provide.

**The offense was a discrete episode.** The offense conduct occurred between approximately August 2017 and April 2019—a total of about eighteen months. PSR ¶¶ 2–4. It ended in April 2019. *See* PSR ¶ 2.

During the nearly seven years between April 2019 and the February 2026 trial, Mr. French did not engage in any criminal conduct. Although he was not arrested until April 2024, *see* Doc. 7, he assisted his wife in running The Arbors, an event venue she owns in Amory. Throughout that

17

period, the community that had known him for decades continued to trust him with their children, their elderly, and their church. That evidence—of how he chose to live once the criminal conduct ended—supports a sentence that recognizes the reality of the man, not only the reality of the eighteen months.

**Health.** Although the PSR records Mr. French's longstanding but well-controlled hypertension and gout, *see* PSR ¶ 56, that is no longer the full picture. Since being remanded to custody in February 2026, Mr. French's health has noticeably declined. He has been diagnosed with chronic kidney disease, which is the same condition from which his father recently passed away. The diagnosis is new, the disease is progressive, and its trajectory over a 144-month sentence, let alone a sentence approaching the 420-month cap, is not something this Court should ignore in weighing what is "sufficient, but not greater than necessary" under section 3553(a).

**Family impact.** The Court will also consider the impact of Mr. French's incarceration on his family—his wife of more than twenty years; his two college-age children; his niece Sky, whom he helped raise; his widowed mother and his mother-in-law, for both of whom he has been a caregiver; and his siblings. The Court has broad discretion to weigh these family circumstances. *See Pepper v. United States*, 562 U.S. 476, 487–88 (2011) ("Permitting sentencing courts to consider the widest possible breadth of information about a defendant 'ensures that the punishment will suit not merely the offense but the individual defendant.'") (quoted citation omitted). At 144 months, Mr. French would have a chance of release while his mother, now a widow, may still be living, and while his children and niece are in their early adulthood. At or near the 420-month cap, if he survives, he would be released long after his mother and mother-in-law will have passed, and when his own children are in their 50s, perhaps with grown children of their own. There is no interest under section 3553(a)(2) served by that outcome.

18

**E.    Section 3553(a)(2) — Each Purpose Of Sentencing Is Fully Satisfied At 144 Months.**

Section 3553(a)(2) identifies four purposes of sentencing: reflecting the seriousness of the offense, affording adequate deterrence, protecting the public, and providing rehabilitation. Each is fully satisfied at 144 months.

### i.    Seriousness, respect for law, and just punishment.

The conduct here was serious, and a 144-month sentence would reflect that while promoting respect for the law and serving as just punishment.

### ii.    Adequate deterrence.

Although the Eleventh Circuit has observed that "economic and fraud-based crimes are 'more rational, cool, and calculated than sudden crimes of passion or opportunity'" and are "'prime candidate[s] for general deterrence,'" *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006), the Eleventh Circuit has never suggested that general deterrence requires a sentence at or near the statutory maximum. A 144-month sentence is substantial by any measure and fully satisfies the deterrence rationale *Martin* articulates.

The deterrent force of a criminal sentence is not linear in its length. As one district court has noted, "[T]here is a [*sic*] considerable evidence that even relatively short sentences can have a strong deterrent effect on prospective 'white collar' offenders." *United States v. Adelson*, 441 F. Supp. 2d 506, 514 (S.D.N.Y.) (citing Richard Frase, *Punishment Purposes*, 58 Stanford L. Rev. 67, 80 (2005); Elizabeth Szockyj, *Imprisoning White Collar Criminals?*, 23 S. Ill. U. L.J. 485, 492 (1998); United States Sentencing Commission, *Fifteen Years of Guidelines Sentencing 56* (2004) (noting that the Sentencing Guidelines were written, in part, to "ensure a *short but definite period* of confinement for a larger proportion of these 'white collar' cases, both to ensure proportionate punishment and to achieve deterrence") (emphasis supplied). A 144-month sentence—fully

reported in the legal press and fully transparent to any healthcare professional or broker contemplating similar conduct—provides all the general-deterrence signal that longer sentences provide. There is no reason to believe that additional years beyond a substantial sentence materially increase deterrent effect in cases like this.

Specific deterrence is essentially complete at 144 months. Mr. French will emerge in his early sixties. He will have been permanently excluded from federal healthcare programs under 42 U.S.C. § 1320a-7. His assets, to the extent any remain after forfeiture, will be subject to a $110 million restitution obligation. He will have no business, no professional licensure, and no access to the infrastructure that enabled the offense conduct. The marginal specific-deterrent value of years beyond 144 months is essentially nil.

### iii. Protection of the public

Mr. French poses no risk of violent crime and no realistic risk of recidivism in the healthcare fraud context. The supervised release conditions the Court will impose, which the PSR correctly identifies as including financial disclosure and occupational restrictions, combined with the collateral consequences described above, fully address any public-protection interest.

Moreover, the Sentencing Commission's own research confirms two facts that bear directly on the public-protection analysis in this case. First, fraud offenders recidivate at rates among the lowest of any federal offense category. *See* Ex. 26 (*U.S. Sentencing Comm'n, Recidivism Among Federal Offenders: A Comprehensive Overview* (March 2016)) at 20, fig. 8. In addition, recidivism declines sharply with age; defendants released in their fifties and sixties recidivate at a fraction of the rate of younger offenders. *See id.* at 5 ("Offenders … over sixty years old at the time of release had a recidivism rate of 16.0 percent."); Ex. 27 (*U.S. Sentencing Comm'n, The Effects of Aging on Recidivism Among Federal Offenders* (December 2017)) at 3 (for offenders in Criminal History

20

Category I, the rearrest rate for offenders at the age of 60 or older at the time of release is 11.3 percent).

Two facts particular to this case reinforce the point. Mr. French is 48 years old, with significant diagnosed kidney disease and high blood pressure. Under any realistic projection, the Mr. French who returns to the community in his early sixties will be an older, sicker man than the one who enters custody now. He will have neither the capacity nor the opportunity to reenter the healthcare infrastructure that enabled the offense conduct. A 144-month sentence is more than enough to satisfy any rational public-protection interest. A sentence approaching the statutory cap would rest on a public-protection theory that the record does not support.

### iv.  Rehabilitation.

Twelve years provides ample time for Bureau of Prisons programming. Mr. French has no documented mental health or substance abuse concerns and no educational deficits that would require longer institutional treatment. His rehabilitative needs, to the extent he has any, are fully addressable within a 144-month sentence.

### v.  Restitution.

Section 3553(a)(7) requires the Court to consider "the need to provide restitution to any victims of the offense," and mandatory restitution under 18 U.S.C. § 3663A will be imposed regardless of the custodial sentence this Court selects. Three features of the restitution picture in this case bear on that analysis: the obligation must be structured to be compensatory rather than duplicative; it should reflect the treatment every similarly situated co-conspirator has received in this same prosecution; and its size and duration are themselves a substantial sanction that the Court should weigh in calibrating the custodial term.

      (a)      **The restitution order should designate joint and several liability with the co-conspirators already ordered to pay restitution for overlapping Medicare and CHAMPVA losses.**

The PSR recommends holding Mr. French solely liable for $110,753,619.63 to Medicare and CHAMPVA. PSR ¶¶ 26, 80. But doing so would be inconsistent with both the Mandatory Victims' Restitution Act's compensatory purpose and the government's own treatment of every other defendant in this same investigation.

The MVRA authorizes restitution only for losses actually caused by the offense. *Hughey v. United States*, 495 U.S. 411, 420 (1990); *accord United States v. Futrell*, 209 F.3d 1286, 1292 (11th Cir. 2000) (restitution must not "exceed the victim's loss"). Therefore, "[i]f the court finds that more than 1 defendant has contributed to the loss of a victim, the court may make each defendant liable for payment of the full amount of restitution *or may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant*." 18 U.S.C. § 3664(h) (emphasis added).

The loss figure the PSR attributes to Mr. French is the combined Medicare loss from two sources: approximately $35 million billed through the eight DME companies Mr. French controlled and approximately $162.8 million billed by other DME companies using orders Mr. French sold to Steven Parker and others. PSR ¶ 23. Those downstream billings are the same billings that generated the Medicare payments underlying the restitution orders already entered against other defendants in this same investigation:

- **Jonathan Rouffe** (8:20-cr-173-TPB-CPT): $10,725,607.15—joint and several with Richard Davidson.

- **Mitchell Chow** (8:22-cr-425-CEH-AEP): $10,535,432.95—joint and several with Z. Hayat, S. Hayat, Rouffe ($195,000 cap), Friedman ($4,000 cap), and others.

- **Salma Hayat** (8:22-cr-351-CEH-TGW): $16,151,792.95—joint and several with Zeeshan Hayat and Mitchell Chow.

22

- **Kelly Wolfe** (8:21-cr-28-VMC-JSS): $10,447,963.97—joint and several with Epstein, Nolan, Salvastano, Truglia, and Fernandez.

- **Michelle Koehlinger** (8:22-cr-51-SCB-JSS): $2,766,218.00—joint and several with Kelly Wolfe.

- **Schuyler Poppe** (8:23-cr-27-SDM-AEP): $3,468,683.67—joint and several with Wolfe and Koehlinger (CHAMPVA portion).

- **Samuel Friedman** (8:20-cr-168-SDM-SPF): $3,420,000.00—joint and several via the Chow designation.

- **Steven Parker** (8:23-cr-207-WFJ-AAS) and **Zeeshan Hayat** (8:22-cr-352-VMC-SPF) have pleaded guilty but are awaiting sentencing.

*See* Ex. 28. Each of these judgments thus designates joint and several liability, many of them with specific caps that reflect the individual defendant's level of contribution under section 3664(h). That is precisely the mechanism section 3664(h) contemplates.

Therefore, Mr. French respectfully requests that the Court's restitution order designate joint and several liability with Jonathan Rouffe (No. 8:20-cr-173-TPB-CPT), Mitchell Chow (No. 8:22-cr-425-CEH-AEP), Salma Hayat (No. 8:22-cr-351-CEH-TGW), Zeeshan Hayat (No. 8:22-cr-352-VMC-SPF), and Steven Parker (No. 8:23-cr-207-WFJ-AAS), for that portion of the Medicare loss attributable to fraudulent billings by DME companies that used doctors' orders sold by or through R&L Marketing and Mr. French.[3] That downstream loss is the same loss already ordered against those defendants.

In addition, Mr. French respectfully requests that the Court's restitution order designate joint and several liability with Kelly Wolfe (No. 8:21-cr-28-VMC-JSS), Michelle Koehlinger (No. 8:22-cr-51-SCB-JSS), Schuyler Poppe (No. 8:23-cr-27-SDM-AEP), and Samuel Friedman (No.

---

[3] Steven Parker and Zeeshan Hayat have pleaded guilty but are awaiting sentencing. Mr. French requests that the Court direct that his restitution be joint and several with each of them upon entry of their respective restitution orders, without requiring a further hearing.

8:20-cr-168-SDM-SPF) for any overlapping portion of the Medicare and CHAMPVA loss attributable to billings by the eight DME companies Mr. French controlled, to the extent that loss overlaps with losses already ordered in those cases.

> **(b)** **Alternatively, the Court should apportion Mr. French's liability under section 3664(h) to reflect his level of contribution and economic circumstances.**

If the Court declines to enter joint and several designations for specific co-conspirators, section 3664(h) independently authorizes apportionment "to reflect the level of contribution to the victim's loss and economic circumstances of each defendant." The PSR identifies Mr. French's personal gain from the scheme at approximately $27.26 million. PSR ¶ 24. His contribution to the downstream $162.8 million in billings (PSR ¶ 23) was limited to selling doctors' orders to brokers and other DMEs; the actual billing decisions, claim submissions, and receipt of Medicare payments were made by entities and individuals Mr. French did not control. Apportionment under section 3664(h) is appropriate to ensure that Mr. French's restitution liability bears a reasonable relationship to the conduct for which he is directly responsible, rather than to the full sum of losses caused by every co-conspirator in a nationwide scheme.

> **(c)** **Interest should be waived under 18 U.S.C. § 3612(f)(3).**

Every related defendant in this investigation who has been sentenced to date has received a waiver of interest on restitution. *See* Ex. 28. Section 3612(f)(3) authorizes the Court to waive interest upon a finding that the defendant does not have the ability to pay it. On a principal obligation of this magnitude, that finding is essentially self-executing. Mr. French respectfully requests that interest be waived.

**(d)    Forfeited proceeds and seized assets should be credited against restitution under 18 U.S.C. § 3664(j)(2).**

The Indictment identifies substantial seized assets—bank accounts, annuity contracts, and cashier's check proceeds—that the government has alleged are traceable to the offense or represent substitute assets. PSR ¶ 5(a)–(s). Mr. French acknowledges that restitution and forfeiture are separate remedies that serve distinct purposes, and that he is not automatically entitled to offset one against the other. *See United States v. Joseph*, 743 F.3d 1350, 1354 (11th Cir. 2014). He respectfully requests, however, that the Court's restitution order provide that any payments actually received by Medicare or CHAMPVA from any source—including, but not limited to, any restoration or remission of forfeited proceeds directed by the Attorney General under 18 U.S.C. § 981(e) and 28 C.F.R. Part 9—shall reduce the outstanding restitution balance by the amount of any such payment, consistent with 18 U.S.C. § 3664(j)(2) and the compensatory purpose of the MVRA. *See Hughey*, 495 U.S. at 420.

**(e)    The payment schedule should be consistent with the schedules imposed on co-conspirators.**

Section 3664(f)(2) requires the Court to consider the defendant's financial resources, projected earnings, and financial obligations in establishing a payment schedule. The co-conspirators' schedules reflect the reality that defendants emerging from federal custody with substantial restitution obligations have modest ability to pay: $100 per month for Koehlinger; $100 per month for Friedman; $200 per month for Chow; $200 per month for Hayat; $300 per month for Rouffe. *See* Ex. 28. Mr. French respectfully requests that the Court set a post-release payment schedule in the same range, subject to adjustment under section 3664(k) upon any material change in his economic circumstances, and subject to the mandatory in-custody rate of either $25 quarterly (non-UNICOR) or 50% of monthly UNICOR earnings.

**(f)      The size and duration of the restitution obligation is itself a substantial sanction that bears on the custodial analysis under section 3553(a)(2).**

Finally, whatever its final structure, the restitution obligation in this case will follow Mr. French for the remainder of his life. Under 18 U.S.C. § 3613(b) and (f), it is enforceable as a civil judgment and as a federal tax lien for twenty years after release, renewable for an additional twenty years. It will materially advance the punishment and general-deterrence goals of section 3553(a)(2)(A) and (B). And the length of imprisonment directly affects the extent to which the obligation can be satisfied: while incarcerated, Mr. French will make little or no meaningful payment; a sentence that leaves him with a period of productive post-release life preserves the possibility of employment and restitution contributions. Each additional year of incarceration beyond what section 3553(a) requires is a year in which Medicare and CHAMPVA receive nothing. The Court should consider the combined punitive and compensatory weight of the restitution sanction in calibrating a custodial sentence that is sufficient, but not greater than necessary.

That punitive weight is no longer merely a matter of practical observation. In *Ellingburg v. United States*, 607 U.S. 163, 166 (2026), the Supreme Court held that restitution under the MVRA is criminal punishment, not a civil remedy. That holding has direct consequences here. Because MVRA restitution is now recognized as "punishment" in the constitutional sense, the Eighth Amendment's Excessive Fines Clause applies to it. *See Timbs v. Indiana*, 586 U.S. 146, 150–51 (2019); *United States v. Bajakajian*, 524 U.S. 321, 334 (1998). And, under *Bajakajian*, a punitive monetary sanction violates the Excessive Fines Clause if it is "grossly disproportional to the gravity of [the] defendant's offense." 524 U.S. at 334. Mr. French respectfully submits that a $110 million restitution obligation, imposed on a defendant whose realistic lifetime ability to pay is a small fraction of that amount, fails that test as applied.

26

The disproportionality is concrete. According to the National Association of Criminal Defense Lawyers, federal defendants currently owe more than $110 billion in restitution, of which approximately $100 billion has been classified as uncollectible due to an inability to pay. *See* Ex. 31 at 19. Those numbers reflect the predictable consequence of section 3664(f)(1)(A)'s command that courts impose "full-amount" restitution "without consideration of the economic circumstances of the defendant": a paper system of nominal compensation that functions, in real life, as a system of indefinite financial control over defendants who will never satisfy the judgment. That rule was tolerable so long as restitution was understood as a civil remedy. Because the Supreme Court has clarified that restitution is criminal punishment, the resulting nominal-versus-actual gap becomes a constitutional problem under *Bajakajian*. Mr. French accordingly preserves an as-applied challenge under the Excessive Fines Clause to the $110 million principal amount and respectfully requests that the Court find that the amount is grossly disproportional to his offense conduct and economic circumstances.

At a minimum, that constitutional concern reinforces the structural requests made in subsections (a) through (e) above—joint and several designation, apportionment under section 3664(h), interest waiver, crediting of forfeited proceeds, and a realistic post-release payment schedule—each of which is a tool available within the MVRA's framework to ensure that the criminal sanction this Court imposes bears some proportional relationship to the conduct, the defendant, and the realistic prospect of compensation to the victims. And it reinforces the point made in the preceding paragraph: that the punitive weight of the restitution sanction is itself a substantial component of the punishment, and section 3553(a)(2) is satisfied to that extent.

**IV.    Conclusion**

A sentence of 144 months' imprisonment is substantial by any measure. It reflects the jury's verdict and the seriousness of the conduct, promotes respect for the law, and provides just punishment. At the same time, it aligns with the national sentencing data, fits within the range imposed in closely comparable cases, and avoids treating Mr. French as an outlier among similarly situated defendants.

Such a sentence also accounts for Mr. French as an individual. It recognizes a life that, outside of the offense conduct, has been defined by family responsibility, community ties, and consistent compliance under years of government scrutiny. It leaves room for meaningful punishment while avoiding a sentence that is greater than necessary to serve the purposes of sentencing.

Mr. French therefore respectfully requests that the Court impose a sentence of 144 months' imprisonment, to be followed by a three-year term of supervised release with the financial disclosure condition recommended in the PSR and restitution as required by 18 U.S.C. § 3663A, structured to avoid duplicative recovery and to reflect the principles set forth above.

Respectfully submitted,

By:    /s/ *Linda Julin McNamara*
Linda Julin McNamara
13155 Noel Road, Suite 900
Dallas, TX 75240
Telephone: (813) 784-7921
linda@federal-lawyer.com

Counsel for Defendant Joel Rufus French

**CERTIFICATE OF SERVICE**

I hereby certify that on April 28, 2026, a true and correct copy of the foregoing was filed with the Clerk of Court using the CM/ECF system, which will send a notice of electronic filing to all counsel of record, including counsel for the United States.

/s/ *Linda Julin McNamara*
Linda Julin McNamara