Exhibit 26

# Recidivism Among Federal Offenders:
## A Comprehensive Overview

**UNITED STATES SENTENCING COMMISSION**



**UNITED STATES SENTENCING COMMISSION**
ONE COLUMBUS CIRCLE, N.E.
WASHINGTON, DC 20002
*WWW.USSC.GOV*

**Patti B. Saris**
*Chair*

**Charles R. Breyer**
*Vice Chair*

**Dabney L. Friedrich**
*Commissioner*

**Rachel E. Barkow**
*Commissioner*

**William H. Pryor, Jr.**
*Commissioner*

**Michelle Morales**
*Ex Officio*

**J. Patricia Wilson Smoot**
*Ex Officio*

**Kenneth P. Cohen**
*Staff Director*

**Glenn R. Schmitt**
*Director*
*Office of Research and Data*

**March 2016**

**Kim Steven Hunt, Ph.D**
*Senior Research Associate*

**Robert Dumville**
*Research Associate*

**TABLE OF CONTENTS**

| | | |
|---|---|---:|
| *PART I* | **INTRODUCTION** | **2** |
| *PART II* | **SUMMARY OF KEY FINDINGS** | **4** |
| *PART III* | **DESCRIPTION OF METHODOLOGY AND STUDY GROUP** | **6** |
| | *Defining and Measuring Recidivism* | *7* |
| | *Methodology* | *8* |
| | *The Study Group* | *9* |
| *PART IV* | **DETAILED RECIDIVISM FINDINGS** | **14** |
| | *General Recidivism Rates* | *15* |
| | *Most Serious Recidivism Offense* | *17* |
| | *Recidivism and Criminal History* | *18* |
| | *Recidivism and an Offender's Federal Offense* | *20* |
| | *Recidivism and Sentences Imposed* | *22* |
| | *Recidivism and Offender Characteristics* | *23* |
| *PART V* | **CONCLUSION** | **26** |
| | **ENDNOTES** | **28** |
| | **APPENDIX** | **34** |

# PART I

*Introduction*

*This report provides a broad overview of key findings from the United States Sentencing Commission's study of recidivism of federal offenders. The Commission studied offenders who were either released from federal prison after serving a sentence of imprisonment or placed on a term of probation in 2005. Nearly half (49.3%) of such offenders were rearrested within eight years for either a new crime or for some other violation of the condition of their probation or release conditions. This report discusses the Commission's recidivism research project and provides many additional findings from that project. In the future, the Commission will release additional publications discussing specific topics concerning recidivism of federal offenders.*

The United States Sentencing Commission[1] began studying recidivism shortly after the enactment of the Sentencing Reform Act of 1984 (SRA). [2] Past studies, together with ongoing multi-year research on this subject, advance the Commission's mission to conduct research on sentencing issues related to the purposes of sentencing set forth in the SRA.[3] Recidivism information is central to three of the primary purposes of punishment as described in the SRA – specific deterrence, incapacitation, and rehabilitation – purposes which focus on prevention of future crimes through correctional intervention.[4] Information about recidivism also is relevant to the Commission's obligation to formulate sentencing policy that "reflect[s], to the extent practicable, advancements in knowledge of human behavior as it relates to the sentencing process."[5]

Considerations of recidivism by federal offenders were central to the Commission's initial work, as it chose to develop the *Guidelines Manual*'s criminal history provisions in significant part on offenders' risk of reoffending.[6] The Commission's 2004 report, *Measuring Recidivism*, served as a "performance review" of the predictive ability of these provisions, *i.e.*, the predictive statistical power of the criminal history measure to reflect subsequent recidivism among federal offenders. That report concluded that these provisions largely succeeded in predicting subsequent risk of reoffending.[7] Two additional Commission reports in that same period further investigated federal offender recidivism and reviewed features of the federal sentencing guidelines.[8] Two later publications examined recidivism by federal offenders sentenced under the guidelines for child pornography and crack cocaine.[9]

Recent developments have refocused the Commission's interest on the recidivism of federal offenders, particularly the recent public attention on the size of the federal prison population and the cost of incarceration.[10] Well over 1.5 million offenders have been sentenced under the federal sentencing guidelines since their inception in 1987. In recent years, approximately 80,000 offenders have been sentenced each year for federal felonies and Class A (non-petty) misdemeanor offenses.[11] Nine out of ten of those federal offenders today receive sentences of imprisonment, while one out of ten is sentenced to probation.[12] The federal prison population today is slightly under two hundred thousand inmates[13] (which is around one-eighth of the total prison and jail population in the United States).[14] As these numbers have grown, courts and correctional officials have sought greater information about reoffending. Recidivism information has recently been used in decisions by the Commission to reduce the periods of incarceration established for certain offenders through retroactive application of sentence reductions in the guidelines.[15] And changes in the sentencing guidelines at the policy level have a significant effect on the imposition of individual sentences.[16] It is in this policy climate that the Commission has begun its multi-year study of recidivism by federal offenders.

The Commission's current recidivism research substantially expands on the scope of previous Commission recidivism projects. In addition to a different set of offenders – U.S. citizen federal offenders released in 2005 – the current study group (25,431 offenders) is much larger than those in previous Commission studies. A larger study group provides the opportunity to develop statistically useful conclusions about many subgroups of federal offenders, including those sentenced under different provisions in the guidelines. This is the first report on the results of the Commission's study of the recidivism of the federal offenders released during this time period.

PART II

*Summary of Key Findings*

**The key findings of the Commission's study are:**

- Over an **eight year follow-up period**, almost one-half of federal offenders released in 2005 **(49.3%) were rearrested** for a new crime or rearrested for a violation of supervision conditions.

- Almost one-third **(31.7%)** of the offenders **were also reconvicted**, and one-quarter **(24.6%)** of the offenders **were reincarcerated** over the same study period.

- Offenders released from incarceration in 2005 had a rearrest rate of 52.5 percent, while offenders released directly to a **probationary sentence** had a **rearrest rate of 35.1 percent**.

- Of those offenders who recidivated, most did so within the first two years of the eight year follow-up period. The **median time to rearrest was 21 months**.

- About **one-fourth** of those rearrested had an **assault rearrest as their most serious charge** over the study period. Other common most serious offenses were drug trafficking, larceny, and public order offenses.

- A federal **offender's criminal history** was closely **correlated with recidivism** rates. Rearrest rates range from 30.2 percent for offenders with zero total criminal history points to 80.1 percent of offenders in the highest Criminal History Category, VI. **Each additional criminal history point was generally associated with a greater likelihood of recidivism**.

- A federal **offender's age** at time of release into the community was also **closely associated** with differences in **recidivism** rates. Offenders released prior to age 21 had the highest rearrest rate, 67.6 percent, while offenders over sixty years old at the time of release had a recidivism rate of 16.0 percent.

- Other factors, including **offense type and educational level**, were associated with differing rates of recidivism but less so than age and criminal history.

*More detailed findings are contained below in Part IV.*

## Recidivism Study Offenders

The offenders studied in this project are **25,431 federal offenders** who:

- are **citizens**;

- **re-entered the community during 2005** after discharging their sentence of incarceration or by commencing a term of probation in 2005;

- have **valid FBI numbers** which could be located in criminal history repositories (in at least one state, the District of Columbia, or federal records);

- are **not** reported **dead, escaped, or detained**, and

- have a **pre-sentence investigation report** that was **submitted** to the Commission with a federal **sentence that** was **not vacated**.

# PART III

---

## *Description of Methodology and Study Group*

## Defining and Measuring Recidivism

Recidivism "refers to a person's relapse into criminal behavior, often after the person receives sanctions or undergoes intervention for a previous crime."[17] Recidivism measures can provide policy makers with information regarding the relative threat to public safety posed by various types of offenders, and the effectiveness of public safety initiatives in (1) deterring crime and (2) rehabilitating or incapacitating offenders.[18] Recidivism measures are used by numerous public safety agencies to measure performance and inform policy decisions and practices on issues such as pretrial detention, prisoner classification and programming, and offender supervision in the community.[19]

Recidivism is typically measured by criminal acts that resulted in the rearrest, reconviction, and/or reincarceration of the offender over a specified period of time.[20] These are the three recidivism measures used in this report. Providing multiple measures of recidivism allows users to select the performance measure best suited to their outcome of interest.[21]

**Rearrest** classifies a person as a recidivist if he or she has been arrested for a new crime after being released into the community directly on probation or after serving a term of imprisonment. Rearrest also includes arrests for alleged violations of supervised release, probation, or state parole.[22] The number of rearrests in the Commission's analysis is based on the number of unique arrest dates, regardless of the number of individual charges arising from a single arrest event. Thus, if an offender was arrested on a single occasion for both driving under the influence and possession of cocaine, that arrest date would constitute a single rearrest event.

**Reconviction** classifies a person as a recidivist if an arrest resulted in a subsequent court conviction. Violations and revocations of supervision are not included in reconvictions since no formal prosecution occurred.

**Reincarceration** classifies a person as a recidivist if a conviction or revocation resulted in a prison or jail sentence as punishment. The reincarceration measure counts offenders who were reported returned to the Federal Bureau of Prisons, state prison, or local jail for any term of incarceration.

For example, many rearrests do not ultimately result in a reconviction or reincarceration for reasons relating to procedural safeguards (*e.g.*, the suppression of evidence for an unconstitutional search or seizure), lack of sufficient evidence to convict or revoke, and prosecutorial or judicial resource limitations. To the extent that the rearrest event is an accurate indicator of relapse into criminal behavior, excluding events due to non-conviction or non-incarceration will result in underestimation of recidivism. Even using the least restrictive measure, rearrest, does not count the full extent of offender recidivism, as many crimes go unreported to police or, if reported, do not result in an arrest. For these reasons, no measure is perfect, and reporting several measures provides a more complete and nuanced picture of reoffending.[23] The three measures overlap in some areas – meaning all offenders who were reconvicted or reincarcerated also were necessarily rearrested, too. Some offenders who were reconvicted, however, were not reincarcerated. Generally speaking, however, the measure of rearrest is larger than the measure of reconviction, which in turn is larger than the measure of reincarceration.

Two principal research choices can affect the relative magnitude of recidivism as measured in any study: first, which events are being included as evidence of reversion to criminal behavior; and second, over what time period these events are counted. The period of time over which events are counted following release into the community is the "follow-up period." Recidivism analysis begins with a starting event, such as release from prison into the community, and may have one or more subsequent events, such as arrests, recorded before the close of the follow-up period. In some studies, follow-up periods may be quite short, for example six months. Other studies follow offenders in the community for substantially longer periods, which may extend to several years. The longer the follow-up period, the higher the reported recidivism rate, because some offenders who did not recidivate within the first year of release recidivate in the second year, and other offenders who did not recidivate during the first two years recidivated thereafter. Longer follow-up periods are in this sense less restrictive, and come closer to estimating true rate of desistance from crime.

The Commission selected an eight year follow-up period for its research. The Commission also considered all recidivism events (including felonies, misdemeanors, and "technical" violations of the conditions of supervision) except the Commission excluded minor traffic offenses. In this report and accompanying appendices, the Commission will include findings using all three measures: rearrest, reconviction, and reincarceration. The measures of rearrest, reconviction, and reincarceration are reported as the percentage of offenders who recidivated by that measure. As noted, those measures overlap in some areas.

*Page 7*

This report provides additional important information regarding the recidivism of federal offenders. First, the Commission reports the time to the first recidivism event for those offenders who recidivated. Studying the timing of recidivism can help understand the process of desistance, as some offenders may be able to remain in the community for a considerable time before recidivating, while others recidivate very quickly. The Commission also reports the median number of recidivism events for those who recidivated, again using the three recidivism measures. With a follow-up period of eight years, many offenders recidivate more than once. Knowing how often they recidivate and for what crimes can provide important information to policymakers. Finally, the Commission reports the most serious post-release event for those who recidivated, as some crimes represent greater harm to society than others.

This report presents the findings of a much larger group of offenders than previous Commission reports, due largely to recent technological advances described below that make this possible. As with previous Commission reports, the present multi-year study of recidivism of federal offenders seeks not only to describe recidivism results generally, but also to relate these results to current sentencing policy questions as may be appropriate in light of the information obtained.

Two other recent recidivism reports are particularly relevant to the present Commission study, although differing with respect to follow-up period and in some other ways. First, the Bureau of Justice Statistics of the U.S. Department of Justice began issuing reports on recidivism among prisoners released from state prisons in the 1980s with *Recidivism of Prisoners Released in 1983*, and recently issued *Recidivism of Prisoners Released in 30 States in 2005: Patterns from 2005 to 2010*.[24] Among state prisoners released in 2005, 67.8 percent of released prisoners were arrested for a new crime within three years, and 76.6 percent were arrested within five years. Many prisoners (36.8%) who were arrested during the five-year period were arrested within the first six months, and 56.7 percent were arrested by the end of the first year.

Second, the Office of Probation and Pretrial Services of the Administrative Office of the U.S. Courts (AO) sponsored a report in 2012 on the recidivism of federal offenders prepared by Abt Associates. The AO study, *Recidivism of Federal Offenders on Federal Community Supervision*,[25] also followed federal offenders released into the community in fiscal year 2005. The AO found that 38 percent of offenders recidivated within five years, including 24 percent who were re-arrested for a new crime and 13 percent who were revoked from probation or supervised release. Unlike the Commission's present research, the AO study excluded most public order offenses from criminal acts counted in its recidivism measure. The report also examined how

recidivism rates varied with the presence of various offender risk (*e.g.*, substance abuse issues) and protective (*e.g.*, positive social support) factors.

## Methodology

Technological advances have allowed the Commission to examine all U.S. citizen federal offenders released in 2005 who meet the study criteria discussed below, greatly expanding the number of federal offender records analyzed over past Commission analysis. Following a practice pioneered by the Bureau of Justice Statistics,[26] the Commission entered into a data sharing agreement with the FBI's Criminal Justice Information Services (CJIS) Division and the Administrative Office of the United States Courts to provide the Commission with electronic access to criminal history records (*i.e.*, RAP sheets) through the CJIS's Interstate Identification Index (III). The CJIS's III allows authorized agencies to determine whether any repository has criminal history records on an individual. Results received over this system provide an individual's criminal history record maintained by all U.S. states, the District of Columbia, and federal agencies. Once automated records were obtained, the Commission went through an extensive process to standardize offense descriptions across all reporting agencies, because states use a variety of state-specific text descriptions and other citations to report the type of offense. Disposition information received from law enforcement agencies and courts was also standardized.

Using an automated software program that analyzed and classified offender criminal records, the Commission identified and processed the criminal records of more than 35,000 offenders who had a valid FBI number in either Commission or Bureau of Prisons records and were released during the study period, which included primarily calendar year 2005 but was extended before and after this year to expand the sample for certain groups. To be included in the final cohort, study subjects must have been federal offenders:

- who are citizens;
- who re-entered the community after discharging their sentences of incarceration or by commencing a term of probation in 2005;[27]
- whose pre-sentence investigation report was submitted to the Commission;
- who have valid FBI numbers which could be located in criminal history repositories (in at least one of the 50 states, DC, or federal records); and

- who were not reported dead, escaped, or detained; and
- whose federal sentence was not vacated.

The Commission examined all offenses committed by the offenders in the study group and ranked the offenses in order of seriousness. In general, the Commission followed a widely accepted ranking scheme used by the Bureau of Justice Statistics in prior recidivism research.[28] The ranking generally begins with the most serious violent crimes, proceeds to less serious violent crimes, next ranking property, drug, and public order crimes. The exception to this general pattern is that the Commission ranked drug trafficking just below violent crimes and above all property crimes.

The study expands on previous Commission practice in another sense. This study cohort was tracked in the community for eight years, compared to previous follow-up periods that ranged from two to five years. Because the risk of re-offending may extend for long periods after release into the community, longer follow-up periods may reveal recidivism that would otherwise be undetected. The longer period may also provide insight into offenders with multiple recidivism incidents, or periods of activity and inactivity.

## The Study Group

This report examines 25,431 offenders who were released into the community (either from federal prison or on to probation) in calendar year 2005 and met all of the above criteria. The advantages of this large study group are substantial. Having several thousand offenders allows more precise estimates of recidivism rates across different subgroups. For example, there are 4,664 female offenders in this study, and 1,048 released offenders were older than sixty years of age.

### Offender Demographics

Male offenders constituted more than four of every five (81.7%) offenders in this study. White offenders were the largest group (43.7%), followed by Black (33.9%), Hispanic (17.8%), and Other Race (4.6%).

The median age at time of sentencing was 33 years for offenders in this study. The median age at release was 36 years. However, over four percent of offenders were released into the community after age sixty. Regarding the highest education level attained by released offenders, about one-third (34.3%) did not complete high school, while most (65.7%) completed at least high school, including some offenders (7.5%) who were college graduates.



*Figure 1.*
**Demographic Characteristics of Recidivism Study Offenders**

| Race/Ethnicity | |
| --- | --- |
| White | 43.7% |
| Black | 33.9% |
| Hispanic | 17.8% |
| Other | 4.6% |
| **Gender** | |
| Male | 81.7% |
| Female | 18.4% |
| **Education** | |
| Less Than High School Graduate | 34.3% |
| High School Graduate | 36.9% |
| Some College | 21.4% |
| College Graduate | 7.5% |

SOURCE: U.S. Sentencing Commission's 2005 Recidivism Release Cohort Datafile, RECID05. Of the 25,431 cases in this study, the Commission excluded cases from this analysis that were missing information necessary to perform the analysis.

*Federal Offense Type and Criminal History*

Over two in five (41.7%) federal offenders released in 2005 and included in this study group were released after receiving a conviction for a federal offense of drug trafficking. Other federal offenses which were common to this study group are fraud (13.6%); unlawful receipt, possession, or transportation of firearms (12.8%); robbery (4.3%); larceny (3.9%); and immigration[29] (3.5%). All other offenses constituted the remaining 20. 3 percent.

An offender's prior criminal record is an important consideration at sentencing. Offenders sentenced in the federal system usually receive criminal history points for each prior sentence based on the number and severity of past criminal conduct. For example, each prior sentence of imprisonment exceeding one year and one month generally receives three points. In addition to points for prior sentences, if the defendant committed the federal offense while under any criminal justice sentence, such as probation, two additional points are added. Some prior sentences are not counted because of staleness, their minor nature, or other reasons.[30] The total number of criminal history points determine the Criminal History Category (I-VI) to which the offender is assigned for the purpose of determine the sentencing guideline range.

Criminal History Category (CHC) I comprises 53.6 percent of the study group, and is assigned to offenders with zero or one criminal history point, the lowest or least serious level of past criminal conduct. In contrast, 7.6 percent of offenders in this study were assigned to CHC VI (13 or more criminal history points), indicating the highest or most serious level of past criminal conduct.



*Figure 2.*

**Offense Types and Criminal History Scores of Recidivism Study Offenders**

| Offense Type | |
|---|---|
| Drug Trafficking | 41.7% |
| Fraud | 13.6% |
| Firearms | 12.8% |
| Robbery | 4.3% |
| Larceny | 3.9% |
| Immigration | 3.5% |
| All Other | 20.3% |

SOURCE: U.S. Sentencing Commission's 2005 Recidivism Release Cohort Datafile, RECID05. Of the 25,431 cases in this study, the Commission excluded cases from this analysis that were missing information necessary to perform the analysis.

*Sentences Originally Imposed*

The offenders in this study were sentenced for their instant federal offenses between 1990 and 2005. About one-quarter of offenders were sentenced before 2002 while about three-quarters of offenders were sentenced before 2005. Of all the offenders in the study, over three-quarters (77.8%) were sentenced before the Supreme Court's January 12, 2005 decision in *United States v. Booker,*[31] which held that the sentencing guidelines were advisory only.

At their original sentencings for their instant federal offenses, 14.1 percent of the offenders in the study group were sentenced to probation only (*i.e.*, probation with no condition of confinement); 4.7 percent were sentenced to probation with a condition of confinement; 3.9 percent were sentenced to a "split" sentence of imprisonment to be followed by a non-prison alternative confinement; and 77.4 percent were sentenced to a term of imprisonment only.[32] Because the vast majority of offenders who received probation with a condition of confinement served that period of confinement in home detention or in a halfway house rather than in a jail or prison,[33] such offenders will be analyzed together with offenders who received probation without a condition of confinement. Furthermore, because offenders who received "split" sentences received a median term of imprisonment of 5 months, those offenders will be analyzed together with offenders who received sentences of imprisonment only.

Therefore, for ease of analysis and presentation, the discussion of recidivism rates of the study group by sentence type that appear in *Recidivism and Sentences Imposed* below will consider only the following two[34] larger groups of offenders: (1) offenders who received a probationary sentence, regardless of whether it had a condition of confinement (18.8 percent of the study group), or (2) offenders who received a sentence of imprisonment, regardless of whether it was a "split" sentence or a sentence of imprisonment only (81.2 percent of the study group).[35]

The median length of imprisonment for all released offenders was 37 months; however, one-tenth (12.3%) of the offenders received a sentence of ten years or more.

A term of supervised release may be ordered to follow any term of imprisonment, and must be ordered if required by statute.[36] The most common length of supervised release ordered at sentencing (54.0%) was three years. One-quarter (25.2%) of released offenders were ordered to serve five years or more of supervised release, including 0.6 percent ordered to serve ten years or more. Because the study follow-up period was eight years, and the typical length of supervision was not more than three years, most offenders completed their term of supervision, and were no longer on supervision for much of the follow-up period.



*Figure 3.*
**Sentences Imposed on Recidivism Study Offenders**

SOURCE: U.S. Sentencing Commission's 2005 Recidivism Release Cohort Datafile, RECID05. Of the 25,431 cases in this study, the Commission excluded cases from this analysis that were missing information necessary to perform the analysis.

It is important to note that most sentenced offenders released during the study period, with the exception of most probationers, were sentenced prior to the *Booker* decision[37] that rendered the federal sentencing guidelines "effectively advisory."[38]  The impact of this decision, as reported in the Commission's *Report on the Continuing Impact of U.S. v. Booker on Federal Sentencing*, is that "the rates of non-government sponsored below range sentences have increased in most districts."[39]  Three-quarters (77.8%) of offenders discussed in this study were sentenced before *Booker*.

Although the study group was released several years ago, this group is generally well-matched to citizen offenders sentenced in 2014.  Both the study group and citizen offenders sentenced in 2014 are predominantly male (81.7% and 81.2%, respectively).  White offenders are the most numerous race/ethnicity group, 43.7 percent for the study group and 38.1 percent for the 2014 sentenced offenders.  Black offenders (33.9% for the study group and 32.7% for the 2014 sentenced offenders, respectively) and Hispanic offenders (17.8% and 23.4%, respectively) are sufficiently well-matched.  The median age at sentencing for the study group (33 years old) is close to the median for 2014 sentenced citizens (35 years old).

The Criminal History Categories are also well-matched.  CHC I is the most common category for both groups, 53.7 percent for the study group and 46.8 percent for 2014 sentenced offenders.  Conviction for a federal offense of drug trafficking is the most common offense, 41.7 percent of the study group and 36.4 percent for the 2014 sentenced group.  Offenses involving firearms (12.8% and 17.0%, respectively) and fraud (13.6% and 14.2%, respectively) are also well-matched.  Given these similarities, it is reasonable to assume that the recidivism findings available from the study group analysis are relevant to currently sentenced offenders.

# PART IV

*Detailed Recidivism Findings*

## General Recidivism Rates

As mentioned earlier, this report uses three different measures of recidivism—rearrest, reconviction, and reincarceration.

### Rearrest

Almost one-half of offenders released in 2005 (49.3%) were rearrested for a new crime or for an alleged violation of the conditions of their supervision over the eight year follow-up period. The median time to rearrest was 21 months, meaning that for one-half of the offenders rearrest occurred in less than two years following their initial release from prison or placement on probation. Among those who recidivated, the median number of rearrest events (events occurring on separate days) was two, but 21.2 percent of recidivist offenders were rearrested five times or more. When considering only the "most serious" offense committed by those who were rearrested, the most serious event that was most prevalent was assault. About one-fourth (23.3%) of those rearrested had an assault rearrest as their most serious charge over the study period. Other common "most serious" offenses were other public order (15.5%), drug trafficking (11.5%), and larceny (7.7%).

### Reconviction

Almost one-third (31.7%) of offenders were reconvicted over the study period. Most offenders who were reconvicted were reconvicted once. The median time to reconviction, as measured from the date of the arrest that led to the reconviction, was 30 months. About one-fourth (23.9%) of those reconvicted had an assault conviction as their most serious charge over the study period. Other common most serious offenses were drug trafficking (13.5%), other public order (8.7%), and larceny (8.5%).

### Reincarceration

One-quarter (24.6%) of offenders were reincarcerated over the study period. Most offenders who were reincarcerated were reincarcerated once. The median time to arrest for the offense that led to reincarceration was 29 months. More offenders (23.8%) were reincarcerated for an assault crime as their most serious offense than for any other offense. Other common most serious offenses were drug trafficking (14.5%), other public order (8.4%), and larceny (7.8%).

### Comparison to State Prisoners

Compared to a cohort of state prisoners released into the community in 2005 and tracked by the Bureau of Justice Statistics, federal offenders had a lower recidivism rate. BJS found that 76.6 percent of offenders released from state prison were rearrested within five years. The Commission, using a comparable five year follow-up period and including only federal offenders released from prison (*i.e.*, excluding those sentenced to probation or a fine-only), found the recidivism rate for these federal offenders was 44.9 percent.[40]

Using reconviction as the measure of recidivism, BJS found that 55.4 percent of state offenders had an arrest within five years that led to a conviction. The reconviction rate for federal offenders over the same length of time was 26.0 percent. When recidivism is measured by reincarceration, BJS found a 28.2 recidivism rate for state offenders within five years that led to an incarceration, compared to 20.7 percent of the federal offenders in the Commission's study.

*Table 1.*
**Overview of Recidivism Study Findings**

| Recidivism Measure | Rearrest | Reconviction | Reincarceration |
|---|---|---|---|
| Percent | 49.3% | 31.7% | 24.6% |
| Median Time to Recidivism | 21 Months | 30 Months | 29 Months |
| Median Number of Recidivism Events | 2 | 1 | 1 |
| Most Serious Post-Release Event (%) | Assault (23.3%) | Assault (23.9%) | Assault (23.8%) |
| Median Age at Release | 33 | 32 | 32 |

SOURCE: U.S. Sentencing Commission's 2005 Recidivism Release Cohort Datafile, RECID05. Median age at release is shown for recidivist offenders only.

*Time to First Recidivism Event*

The measure of the time to first recidivism event can be useful in distinguishing offenders who recidivate early from those who eventually recidivate, but are apparently crime-free for a longer interval.  Tracking the length of time to failure can also help policymakers determine an appropriate period of supervision after the release from prison, for example by extending supervision through the peak crime-prone interval.[41]  Time from release to first arrest is shown for all rearrests, reconvictions, and reincarcerations.

During the first year following release into the community, 16.6 percent of the offenders in the Commission's study were rearrested for the first time.  Each subsequent year fewer people were rearrested for the first time than in the previous year, going out to year seven.  For example, 10.5 percent of the total were rearrested in the second year, and 6.6 percent of the total were rearrested in the third year.  An additional 1.8 percent of offenders who were not previously arrested were rearrested in the eighth year, as demonstrated below.

*Table 2.*
**Rearrest Rates for Recidivism Study Offenders**

| *Years After Release* | % | Cumulative % |
|---|---|---|
| **One Year After Release** | 16.6% | 16.6% |
| **Two Years After Release** | 10.5% | 27.1% |
| **Three Years After Release** | 6.6% | 33.7% |
| **Four Years After Release** | 4.7% | 38.4% |
| **Five Years After Release** | 3.7% | 42.1% |
| **Six Years After Release** | 3.0% | 45.1% |
| **Seven Years After Release** | 2.3% | 47.5% |
| **Eight Years After Release** | 1.8% | 49.3% |

SOURCE: U.S. Sentencing Commission's 2005 Recidivism Release Cohort Datafile, RECID05.

*Figure 4.*
**Time to First Rearrest of Recidivism Study Offenders**



SOURCE: U.S. Sentencing Commission's 2005 Recidivism Release Cohort Datafile, RECID05. The reconviction and reconfinement lines indicate time to first arrest that led to a conviction and time to first arrest that led to a confinement, respectively.

## Most Serious Recidivism Offense

The Commission ranked new offenses in order of seriousness for those who reoffended. When considering only the "most serious" post-release offense committed by those who were rearrested, assault was the most prevalent. About one-fourth (23.3%) of those rearrested had an assault rearrest as their most serious post-release event over the study period. Other common "most serious" offenses were public order (15.5%), drug trafficking (11.5%), and larceny (7.7%).

*Figure 5.*

**Recidivism Study Offenders by Most Serious Recidivism Offense**



*Most Serious Recidivism Offense*

SOURCE: U.S. Sentencing Commission's 2005 Recidivism Release Cohort Datafile, RECID05. Of the 25,431 cases in this study, the Commission excluded cases from this analysis that were missing information necessary to perform the analysis.

## Recidivism and Criminal History

The relationship between prior criminal record and recidivism has been recognized by the Commission since its inception in the mid-1980s, as discussed in Chapter Four of the *Guidelines Manual*.[42]  Empirical research assessing correlates of recidivism and criminal career behavior was consulted in formulating the criminal history scoring system[43] and recent research confirms this relationship.[44]  The previously referenced Commission study, *Measuring Recidivism* (2004), confirmed that Chapter Four's criminal history provisions were working as designed, and recidivism rates rise as criminal history points increase and as Criminal History Categories increase.  The present analysis confirms that these criminal history provisions continue to work as designed.

An offender's total criminal history points, which determines the CHC to which the offender is assigned for the purpose of calculating the sentencing range under the guidelines, is designed in part to reflect recidivism potential.  In order "to protect the public from further crimes of the particular defendant, the likelihood of recidivism and future criminal behavior must be considered."[45]  Fully consistent with its previous recidivism studies, the Commission's present study found that recidivism rates are most closely correlated with total criminal history points.  For example, 30.2 percent of offenders with zero total criminal history points were rearrested within eight years, compared to 81.5 percent of offenders with more than 10 total criminal history points.  In fact, each additional criminal history point is generally associated with a greater likelihood of recidivism.  For example, the rearrest rate of offenders with three total criminal history points is 52.7 percent, compared to 59.4 percent for four point offenders.  This pattern continues even at higher total points, with rearrest rates ranging from 71.1 percent (seven point offenders), 74.0 percent (eight point offenders), and 76.1 percent (nine point offenders).[46]

*Figure 6.*

**Rearrest Rates for Recidivism Study Offenders by Criminal History Points**



SOURCE: U.S. Sentencing Commission's 2005 Recidivism Release Cohort Datafile, RECID05. Of the 25,431 cases in this study, the Commission excluded cases from this analysis that were missing information necessary to perform the analysis.

Because an offender's criminal history score determines the CHC to which he or she is assigned, recidivism rates are also correlated with the CHC. That is, the higher the CHC (a result of more prior crimes and/or more serious crimes), the higher the recidivism rate. Rearrest rates ranged from a low of 33.8 percent for those in CHC I to a high of 80.1 percent for those in CHC VI.

Other guideline provisions that account for an offender's prior crimes also serve as good predictors of future recidivism. For example, offenders designated under the guidelines as career offenders[47] and armed career criminals[48] receive substantially increased sentences because they are repeat offenders with serious criminal backgrounds. These offenders have substantially higher recidivism rates than other offenders in the study group. In fact, those two groups of offenders have the highest recidivism rates of any group in this report. Taken together, these offenders had a rearrest rate of 69.5 percent, compared to a rearrest rate of 48.7 percent for all other offenders.

*Figure 7B.*

**Rearrest Rates for Recidivism Study Offenders by Career Offender/Armed Career Criminal Status**



*Figure 7A.*

**Rearrest Rates for Recidivism Study Offenders by Criminal History Category**

| Criminal History Category | Rearrest Rate |
| --- | --- |
| CH Category I (n = 13,581) | 33.8% |
| CH Category II (n = 3,084) | 54.3% |
| CH Category III (n = 3,616) | 63.3% |
| CH Category IV (n = 1,996) | 74.7% |
| CH Category V (n = 1,121) | 77.8% |
| CH Category VI (n = 1,923) | 80.1% |

*Criminal History Category*

SOURCE: U.S. Sentencing Commission's 2005 Recidivism Release Cohort Datafile, RECID05. Of the 25,431 cases in this study, the Commission excluded cases from this analysis that were missing information necessary to perform the analysis.

## Recidivism and an Offender's Federal Offense

The Commission did not find a strong correlation between the severity of the offender's federal offense conduct, as determined under the sentencing guidelines, and future recidivism. Under the guidelines, the seriousness of an offender's federal crime is measured by a final offense level score ranging from one to 43. There is not a strong correspondence between final offense level and recidivism. For example, offenders whose federal offense was assigned to the lowest final offense levels (one through eight) had a rearrest rate of 45.2 percent, almost the same rearrest rate as those assigned the highest final offense levels of 31 through 43 (45.7%). It should be noted, however, that the offense levels in the federal sentencing guidelines were intended to reflect multiple purposes of punishment, including just punishment and general deterrence (which are unrelated to offender recidivism).[49]

Although the specific numerical offense severity determined under the sentencing guidelines appears to not be correlated with recidivism, the type of crime the offender committed does have some correlation with the risk of future crime. Offenders whose federal offense involved firearms were most likely to be rearrested (68.3%), followed by those arrested for robbery (67.3%), immigration (55.7%), drug trafficking (49.9%), larceny (44.4%), other (42.0%), and fraud (34.2%).

Offenders who received an enhanced sentence for a weapon, either through a conviction under 18 U.S.C. § 924(c) or by application of a specific offense characteristic in the guidelines for having a weapon present during commission of a crime,[50] had higher recidivism rates than other offenders. Offenders with such a weapon enhancement had a rearrest rate of 55.4 percent, compared to 48.6 percent for all other offenders.

*Figure 8.*

**Rearrest Rates for Recidivism Study Offenders by Final Offense Level and Federal Offense Type**



SOURCE: U.S. Sentencing Commission's 2005 Recidivism Release Cohort Datafile, RECID05. Of the 25,431 cases in this study, the Commission excluded cases from this analysis that were missing information necessary to perform the analysis.

Offenders who were organizers, leaders, managers, or supervisors of an offense received an aggravating role adjustment of 2, 3, or 4 levels[51] under the guidelines, increasing their total offense level.  Those with such an aggravating role adjustment were less likely to recidivate than other offenders.  Those receiving no adjustment (93.6 percent of all offenders in the study) had a rearrest rate of 50.2 percent.  However, those receiving aggravating role adjustments had recidivism rates of: 37.3 percent (two level increase); 35.6 percent (three level increase); and 33.7 percent (four level increase).

Offenders who were found to have a minor or minimal role in an offense received a mitigating role adjustment of 2, 3, or 4 levels[52] under the guidelines, decreasing their total offense level.  Offenders in the study with such a mitigating role adjustment (10.6% of all offenders) were somewhat less likely to recidivate than other offenders.  Those receiving no adjustment had a rearrest rate of 49.7 percent.  However, those receiving mitigating role adjustments had recidivism rates of: 47.2 percent (two level decrease); 37.5 percent (three level decrease); and 43.6 percent (four level decrease).

An offender who demonstrates acceptance of responsibility for his offense can receive a reduction in offense level of 2 or 3 levels.[53]  The vast majority of all offenders in the Commission's study (90.7%) received a reduction in their guideline range for acceptance of responsibility.  Such an adjustment was not associated with lower recidivism rates.  Offenders with no adjustment under §3E1.1 had a rearrest rate of 46.3 percent.  Offenders who received a two-level decrease had a rearrest rate of 46.6 percent, and those with a three level decrease were higher still (50.9%).

*Figure 9.*
**Rearrest Rates for Recidivism Study Offenders by Selected Guideline Characteristics**



SOURCE: U.S. Sentencing Commission's 2005 Recidivism Release Cohort Datafile, RECID05. Of the 25,431 cases in this study, the Commission excluded cases from this analysis that were missing information necessary to perform the analysis.

## Recidivism and Sentences Imposed

Recidivism rates differ according to the type of sentence imposed. As previously noted, 81.2 percent of the study group were sentenced to some amount of imprisonment. These offenders had the highest rate of rearrest, 52.5 percent. Conversely, offenders sentenced to probationary sentences (18.8 percent of the study group) had a rearrest rate of 35.1 percent.[54]

Offenders with shorter lengths of imprisonment generally had lower recidivism rates. For instance, offenders with sentences of imprisonment of fewer than six months had the lowest rearrest rate at 37.5 percent, followed by offenders with sentences from six to 11 months (50.8 percent), and 12 to fewer than 24 months (50.8%). Conversely, the highest recidivism rates are generally found among offenders with longer sentences. Those with sentences from 60 months to fewer than 120 months had the highest rate (55.5%), followed closely by those with 24 to fewer than 60 months (54.0%), and 120 months or more (51.8%).[55]

The correlation between sentence type and length and recidivism is not, of course, entirely a coincidence. The guidelines are intended, in part, to incapacitate offenders whose criminal records indicate a greater risk of future criminality. Those with prison sentences are incapacitated in a manner that those receiving no term of incarceration are not, and those receiving longer terms of incarceration as a result of their higher CHCs are also at greater risk of recidivism than those receiving no incarceration or a shorter period of incarceration who generally had lower CHCs.

The most common length of supervised release imposed for those offenders who received terms of supervised release to follow their terms of imprisonment was 36 months. Offenders ordered to serve a term of supervised release of three years were the majority of offenders, and this group had the highest rearrest rate, 55.4 percent. The lowest rearrest rate was found among offenders serving a term of supervised release of ten years or more (42.7%), and the second lowest rate occurred with offenders serving two year terms (46.8%).

*Figure 10.*

**Rearrest Rates for Recidivism Study Offenders by Federal Sentences Originally Imposed**



SOURCE: U.S. Sentencing Commission's 2005 Recidivism Release Cohort Datafile, RECID05. Of the 25,431 cases in this study, the Commission excluded cases from this analysis that were missing information necessary to perform the analysis.

## Recidivism and Offender Characteristics

Studies have repeatedly shown that older offenders at sentencing are at lower risk for reoffending, and the Commission's research confirms these findings.[56] Offenders sentenced when younger than twenty-one had a 71.1 percent rearrest rate, compared to 14.0 percent of offenders who are sentenced after age sixty.

Age at release also is associated with different rates of recidivism. Those released into the community who were below age twenty-one had the highest rearrest rate, 67.6 percent. Conversely, those oldest at age of release, over sixty years old, had the lowest recidivism rate, 16.0 percent. For each age grouping shown below, the older the age group, the lower the rearrest rate. The same pattern holds for reconviction and reincarceration.

*Figure 11.*

**Rearrest Rates for Recidivism Study Offenders by Age at Sentencing and Release**



SOURCE: U.S. Sentencing Commission's 2005 Recidivism Release Cohort Datafile, RECID05. Of the 25,431 cases in this study, the Commission excluded cases from this analysis that were missing information necessary to perform the analysis.

Male offenders (52.2%) were rearrested at higher rates than females (36.4%).

Eight years after release into the community, Black offenders had been arrested at the highest rates (59.1%), followed by Other Race (49.4%), Hispanic (49.1%), and White (41.7%) offenders.  However, the apparent relationship between race/ethnicity and recidivism is much less pronounced if the prior criminal history of these offenders is also examined.  For offenders assigned to higher CHCs, recidivism results are similar, regardless of race or ethnicity. Rearrest rates for White, Black, and Hispanic offenders in CHC IV are 69.7 percent, 77.6 percent, and 75.4 percent, respectively.  At CHC V for the same three groups, the rearrest rates are 75.6, 78.5, and 79.9 percent, respectively.  At CHC VI for the same three groups, the rearrest rates are 77.1, 82.4, and 79.3 percent, respectively.  Much of the difference in overall recidivism rates appears to be the result of the differing proportion of Black offenders in CHC I (38.9%), compared to White offenders (59.7%) and Hispanic offenders (62.2%).

Education levels are also associated with different rates of recidivism. Offenders with less than a high school diploma had the highest recidivism rates (60.4%), followed by high school graduates (50.7%) and those with some college (39.3%).  College graduates had the lowest rates (19.1%).

*Figure 12.*

**Rearrest Rates for Recidivism Study Offenders by Selected Demographic Characteristics**



SOURCE: U.S. Sentencing Commission's 2005 Recidivism Release Cohort Datafile, RECID05. Of the 25,431 cases in this study, the Commission excluded cases from this analysis that were missing information necessary to perform the analysis.

# PART V

*Conclusion*

## Conclusion

The study of recidivism by federal offenders directly relates to multiple statutory purposes of punishment as set forth in the Sentencing Reform Act of 1984. Using automated criminal history data, the Commission tracked 25,431 federal offenders who either discharged a federal prison sentence or commenced a term of probation in 2005 during an eight-year follow-up period. The Commission found that almost one-half of these federal offenders who reentered the community in 2005 (49.3%) were rearrested for a new crime or rearrested for a violation of supervision conditions during the follow-up period.

The Commission found that, consistent with existing research,[57] two factors – offenders' criminal histories and their ages at the time of release into the community – were most closely associated with differences in recidivism rates. Younger offenders recidivated at significantly higher rates than older offenders, and offenders with more extensive criminal histories recidivated at significantly higher rates than offenders with lesser criminal histories. Regarding criminal history in particular, the Commission found that an offenders' total criminal history points, as determined under Chapter Four of the Commission's *Guidelines Manual*, were closely correlated with recidivism rates.

Other factors, including educational achievement and offense type, also were associated with differences in recidivism rates, but less so than age and criminal history. Certain factors related to provisions in Chapters Two and Three of the *Guidelines Manual* – including adjustments in an offender's offense level as well as the total offense level – were not associated with differences in rates of recidivism. However, unlike Chapter Four's provisions – which were based in large part on recidivism data – the guideline's offense level computations are based on several purposes of punishment, some of which are unrelated to recidivism, including general deterrence and retributivist concerns.

In the coming months, the Commission will issue additional reports based on its recidivism study.

ENDNOTES

[1] The United States Sentencing Commission ("Commission") is an independent agency in the judicial branch of government. Established by the Sentencing Reform Act of 1984, its principal purposes are (1) to establish sentencing policies and practices for the federal courts, including guidelines regarding the appropriate form and severity of punishment for offenders convicted of federal crimes; (2) to advise and assist Congress, the federal judiciary, and the executive branch in the development of effective and efficient crime policy; and (3) to collect, analyze, research, and distribute a broad array of information on federal crime and sentencing issues. *See* 28 U.S.C. §§ 995(a)(14), (15), (20).

[2] *See* U.S. SENTENCING COMM'N, SUPPLEMENTARY REPORT ON THE INITIAL SENTENCING GUIDELINES AND POLICY STATEMENTS 41-44 (1987), http://www.ussc.gov/sites/default/files/pdf/guidelines-manual/1987/manual-pdf/1987_Supplementary_Report_Initial_Sentencing_Guidelines.pdf (hereinafter SUPPLEMENTARY REPORT)*; see also* U.S. SENTENCING COMM'N, RECIDIVISM AMONG OFFENDERS RECEIVING RETROACTIVE SENTENCE REDUCTIONS: THE 2007 CRACK COCAINE AMENDMENT (2014), http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-projects-and-surveys/miscellaneous/20140527_Recidivism_2007_Crack_Cocaine_Amendment.pdf (hereinafter CRACK COCAINE RECIDIVISM REPORT); U.S. SENTENCING COMM'N, REPORT TO CONGRESS: FEDERAL CHILD PORNOGRAPHY OFFENSES 293-310 (2012), HTTP://WWW.USSC.GOV/SITES/DEFAULT/FILES/PDF/NEWS/CONGRESSIONAL-TESTIMONY-AND-REPORTS/SEX-OFFENSE-TOPICS/201212-FEDERAL-CHILD-PORNOGRAPHY-OFFENSES/FULL_REPORT_TO_CONGRESS.PDF (hereinafter CHILD PORNOGRAPHY REPORT); U.S. SENTENCING COMM'N, A COMPARISON OF THE FEDERAL SENTENCING GUIDELINES CRIMINAL HISTORY CATEGORY AND THE U.S. PAROLE COMMISSION SALIENT FACTOR SCORE (2005), http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2005/20050104_Recidivism_Salient_Factor_Computation.pdf (hereinafter SALIENT FACTOR SCORE); U.S. SENTENCING COMM'N, RECIDIVISM AND THE "FIRST OFFENDER" (2004), http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_First_Offender.pdf (hereinafter FIRST OFFENDER); U.S. SENTENCING COMM'N, MEASURING RECIDIVISM: THE CRIMINAL HISTORY COMPUTATION OF THE FEDERAL SENTENCING GUIDELINES (2004), http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_Criminal_History.pdf (hereinafter MEASURING RECIDIVISM).

[3] 18 U.S.C. § 3553(a)(2)(C).

[4] The SRA provides that:

> The court, in determining the particular sentence to be imposed, shall consider. . . the need for the sentence imposed—
>
> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

*Id.*; *see also* 28 U.S.C. § 991(b) ("[T]he United States Sentencing Commission [shall] establish sentencing policies and practices for the Federal criminal justice system that . . . assure the meeting of the purposes of sentencing as set forth in section 3553(a)(2) of title 18, United States Code."). The SRA requires courts and the Commission to consider both general and specific deterrence. *See* United States v. Martin, 455 F.3d 1227, 1240 (11th Cir. 2006).

[5] 28 U.S.C. § 991(b)(2).

[6] *See* SUPPLEMENTARY REPORT, *supra* note 2, at 41-44.

[7] *See* MEASURING RECIDIVISM, *supra* note 2.

[8] *See generally* SALIENT FACTOR SCORE, *supra* note 2; FIRST OFFENDER, *supra* note 2.

[9] *See* CRACK COCAINE RECIDIVISM REPORT, *supra* note 2; CHILD PORNOGRAPHY REPORT, *supra* note 2, at 293-310.

[10] *See, e.g.,* Final Priorities for Amendment Cycle, 79 FED. REG. 49378, 49379 (Aug. 20, 2014) ("Pursuant to 28 U.S.C. § 994(g), the Commission intends to consider the issue of reducing costs of incarceration and overcapacity of prisons, to the extent it is relevant to any identified priority.").

[11] *See, e.g.*, U.S. SENTENCING COMM'N, ANNUAL REPORT: FISCAL YEAR 2014, A-5 (2014).

[12] Courtney Semisch, U.S. SENTENCING COMM'N, ALTERNATIVE SENTENCING IN THE FEDERAL CRIMINAL JUSTICE SYSTEM (2015), http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-projects-and-surveys/alternatives/20150617_Alternatives.pdf.

[13] FEDERAL BUREAU OF PRISONS, *Statistics*, https://web.archive.org/web/20160211120327/https://www.bop.gov/about/statistics/population_statistics.jsp (Feb. 11, 2016) (reporting 195,730 inmates, including 44,362 non-citizens).

[14] BUREAU OF JUSTICE STATISTICS, PRISONERS IN 2014, http://www.bjs.gov/content/pub/pdf/p14.pdf (1,561,500 state prisoners as of 2014).

[15] *See* USSG, App'x C, amend. 782 ("Reason for Amendment") (in voting to apply an amendment to the drug-trafficking guidelines that reduced offense levels for many offenders, the Commission noted that it "was informed by its studies that compared recidivism rates for offenders who were released early as a result of retroactive application of the Commission's 2007 crack cocaine amendment with a control group of offenders who served their full terms of imprisonment").

[16] Judges are required to apply the federal sentencing guidelines, now "advisory" guidelines following United States v. Booker, 543 U.S. 220 (2005), before deciding what sentence to impose and these guidelines continue to have a significant policy effect on federal sentencing. *See, e.g.*, Peugh v. United States, 133 S. Ct. 2072, 2084 (2013) ("[C]onsiderable empirical evidence indicat[es] that the Sentencing Guidelines have the intended effect of influencing the sentences imposed by judges.").

[17] *See* NAT'L INST. OF JUSTICE, *Recidivism*, https://web.archive.org/web/20160120175242/http://www.nij.gov/topics/corrections/recidivism/pages/welcome.aspx (Jan. 20, 2016).

[18] *See* MICHAEL D. MALTZ, RECIDIVISM 7-20 (2001); *see also* Ryan King & Brian Elderboom, *Improving Recidivism as a Performance Measure*, URBAN INSTITUTE (2014), https://www.bja.gov/Publications/UI-ImprovingRecidivism.pdf.

[19] *See, e.g.*, Christopher T. Lowenkamp, Marie VanNostrand, and Alexander Holsinger, INVESTIGATING THE IMPACT OF PRETRIAL DETENTION ON SENTENCING OUTCOMES (2013), http://pretrialnola.org/wp-content/uploads/2015/09/Investigating-the-Impact-of-Pretrial-Detention-on-Sentencing-Outcomes-2013.pdf; Elizabeth

Drake, Steve Aos, and Marna Miller, *Evidence Based Public Policy Options to Reduce Crime and Criminal Justice Costs: Implications in Washington State*, *in* 4 VICTIMS AND OFFENDERS 170-96 (2009); NAT'L RESEARCH COUNCIL, PAROLE, DESISTANCE FROM CRIME, AND COMMUNITY INTEGRATION, 19-31 (2008).

[20] *Recidivism*, *supra* note 18 ("[R]ecidivism is measured by rearrest, reconviction or return to prison."); *See also*, NAT'L INST. OF JUSTICE, *Measuring Recidivism*, https://web.archive.org/web/20160129195540/http://www.nij.gov/topics/corrections/recidivism/pages/measuring.aspx (Jan. 29, 2016) ("The timing of recidivism is key not only to its measurement but also to understanding the processes underlying the effects of sanctions and interventions with respect to the propensity of the individual to commit crime.")

[21] *See* MALTZ, *supra* note 18, at 20-21, 28-29, 55-58; *Improving Recidivism as a Performance Measure*, *supra* note 19.

[22] Arrests for alleged violations of probation, supervised release, or state parole (as well as actual revocations of any these types of supervision) were counted as rearrests. Revocations were not counted as reconvictions because the offenders were not convicted of a new offense (even if the basis for revocation was a "new law violation"). Offenders whose terms of supervision were revoked and who were sentenced to imprisonment were treated as reincarcerations.

[23] *See* MALTZ, *supra* note 18; *Improving Recidivism as a Performance Measure*, *supra* note 18.

[24] Matthew Durose, Alexia Cooper, and Howard Snyder, BUREAU OF JUSTICE STATISTICS, *Recidivism of Prisoners Released in 30 States in 2005: Patterns from 2005 to 2010* (2014) (hereinafter *Prisoners Released in 30 States in 2005*), http://www.bjs.gov/content/pub/pdf/rprts05p0510.pdf.

[25] William Rhodes, et al., ABT ASSOCIATES, *Recidivism of Offenders on Federal Community Supervision* (2012), https://www.ncjrs.gov/pdffiles1/bjs/grants/241018.pdf.

[26] *Recidivism of Prisoners Released in 30 States in 2005*, supra note 24 (discussing the methodology employed by BJS for collecting and processing criminal records for recidivism research). The Bureau of Justice Statistics is the United States' primary source for criminal justice statistics, including statistics on crime, criminal offenders, victims of crime, and the operation of justice systems at all levels of government. *See* http://www.bjs.gov/index.cfm?ty=abu. Appendix B of this report discusses the procedures employed by the Commission.

[27] All of the federal offenders who re-entered the community after discharging their sentences of incarceration had served those sentences continuously from the time of the imposition of the sentences until the time of the offenders' re-entry in 2005. None of the offenders released from their sentences of incarceration in 2005 had previously been returned to prison upon revocation of probation or supervised release terms imposed in connection with their instant federal offenses of conviction.

[28] *See Prisoners Released in 30 States in 2005, supra* note 24.

[29] Immigration crimes committed by citizens are most commonly sentenced under USSG §2L1.1 (alien smuggling) rather than USSG §2L1.2 (illegal reentry).

[30] *See generally* USSG §§4A1.1; 4A1.2.

[31] 543 U.S. 220 (2005).

[32] These four different sentence types correspond to the four "Zones" (A-D) in the Sentencing Table in the *Guidelines Manual*. *See* USSG, Ch. 5, Pt. A (Sentencing Table); *see also* USSG §§5B1.1 & 5C1.1 (setting forth the sentencing options for Zones A-D). Zone A authorizes probation only; Zone B authorizes probation with a condition of confinement; Zone C authorizes a "split" sentence of imprisonment and community confinement (*e.g.*, home detention or a halfway house); and Zone D authorizes sentences of imprisonment only. *See* USSG §§5B1.1 & 5C1.1.

[33] Of the offenders who received a Zone B sentence of probation with a condition of confinement, only 0.9 percent served the confinement in a jail or prison. The remainder served their confinement in home detention or in community confinement such as a halfway house.

[34] The small percentage of offenders who received a fine only (65 members of the study group) are excluded from the analysis.

[35] Imprisonment sentences are sentences to a term of confinement in the Federal Bureau of Prisons (BOP) with or without a sentence to community confinement or probation to follow (as a condition of supervised release pursuant to USSG §5C1.1(c)(2) or (d)(2)). Probation sentences may include either a period of community confinement. The term alternative confinement refers to a period of confinement in a location other than a BOP facility, usually home detention or a halfway house.

Typically, federal offenders sentenced to terms of imprisonment of less than one year serve their sentences in a local jail or detention center rather than a federal prison. *See* FED. BUREAU OF PRISONS, LEGAL RESOURCE GUIDE TO THE FEDERAL BUREAU OF PRISONS, 2014, 10 (2014),

https://www.bop.gov/resources/pdfs/legal_guide.pdf  ("The BOP will often contract with a local jail or detention center to house an inmate sentenced to a term of one year or less.").   Regardless of whether a federal offender served his or her sentence in a jail or prison, that sentence will be deemed a "sentence of imprisonment" for the analyses that follow.

[36]  U.S. SENTENCING COMM'N, FEDERAL OFFENDERS SENTENCED TO SUPERVISED RELEASE 4-9 (2010).

[37]  *Booker*, 543 U.S. 220.

[38]  *Id*. at 245.

[39]  U.S. SENTENCING COMM'N, REPORT ON THE CONTINUING IMPACT OF U.S. V. BOOKER ON FEDERAL SENTENCING 7 (2012).

[40]  *See Prisoners Released in 30 States in 2005, supra* note 24.  The inmates released from 30 state prisons in 2005 included in the BJS study differ from the population released from federal prison that same year in several respects.  A quarter (25.7 percent) of released state inmates had a violent commitment offense compared to only 6.8 percent of inmates released from federal prison.  State offenders were more likely to be under 40 (68.5 percent) and male (89.3 percent) than the federal offenders (60.1 percent under age 40 and 85.9 percent male).  The BJS study also included non-U.S. citizens, a category of offender excluded from the Commission's study.

[41]  The National Advisory Commission on Criminal Justice Standards and Goals recommends a three year follow-up period, but recognizes this as "an arbitrary figure."  NATIONAL ADVISORY COMMISSION ON CRIMINAL JUSTICE STANDARDS AND GOALS, CORRECTIONS 529 (1973)

[42]  *See* USSG, Ch.4, Pt.A, intro. comment.

[43]  *See* SUPPLEMENTARY REPORT, *supra* note 2, at 41-44.

[44]  *See* RHODES, *supra* note 25 at 12; Alfred Blumstein, David P. Farrington, and Soumyo Moitra, CRIME AND JUSTICE: A REVIEW OF RESEARCH 216 (1985), *Delinquency Careers: Innocents, Desisters, and* Persisters.  In two major cohort studies, the recidivism probability of youthful offenders rose with successive involvements with law enforcement; Paul Gendreau, Tracy Little, and Claire Goggin, Criminology, (2008), *A Meta-Analysis Of The Predictors Of Adult Offender Recidivism: What Works!* at 575.  A meta-analysis of 131 studies found the strongest predictors of recidivism included criminogenic needs, criminal history, social achievement, age/gender/race, and family factors.

[45]  USSG, Ch.4, Pt.A, intro. comment.

[46]  This group falls within CHC IV.

[47]  Career Offenders are persons who commit a crime of violence or drug trafficking crime after being convicted of two prior felony drug trafficking or crime of violence offenses. *See* USSG §4B1.1.

[48]  Armed Career Criminals are persons subject to an enhanced sentence under the provisions of 18 U.S.C. § 924(e).  USSG §4B1.4.

[49]  *See, e.g.*, USSG §2H4.1, comment (backg'd) (1995) ("For purposes of deterrence and just punishment, the minimum base offense level is 15.").

[50]  *See, e.g.*, USSG §2D1.1(b)(1).

[51]  USSG §3B1.1.

[52] USSG §3B1.2.

[53] USSG §3E1.1.

[54] A more detailed analysis of offenders based on the type of sentence imposed – *see supra* note 32 (discussing the four types of sentences that correspond to Zones A-D of the Sentencing Table) – is as follows:  Offenders who received probation only had a rearrest rate of 34.5 percent; offenders who received probation with a condition of confinement had a rearrest rate of 36.9 percent; offenders who received a "split" sentence had a rearrest rate of 37.2 percent; and offenders who received a sentence of imprisonment only had a rearrest rate of 53.3 percent.

[55] 4,870 cases with zero months of imprisonment ordered were excluded.

[56] *See* GENDREAU, *Supra* note 44 at 575; David P. Farrington, *Age and Crime*, *in* Crime and Justice: An Annual Review of Research Vol. 7 (Michael Tonry and Norval Morris, eds., 1986); Jeffery T. Ulmer and Darrell Steffensmeier, *The Age and Crime Relationship: Social Variation, Social Explanations* in The Nurture versus Biosocial Debate in Criminology 378 (K. Beaver, B. Boutwell, and J.C. Barnes, eds., 2014).  "It is now a truism that age is one of the strongest factors associated with criminal behavior."

[57] *See* GENDREAU, *supra* note 44 at 575.

APPENDIX A-1

*Rearrest Rates Across Selected Variables*

**Rearrest Rates Across Selected Variables**

*Criminal History*

| | Total | N | % |
|---|---|---|---|
| **Total** | 25,431 | 12,527 | 49.3% |
| **Criminal History Category** | | | |
| CHC I | 13,581 | 4,594 | 33.8% |
| CHC II | 3,084 | 1,674 | 54.3% |
| CHC III | 3,616 | 2,288 | 63.3% |
| CHC IV | 1,996 | 1,490 | 74.7% |
| CHC V | 1,121 | 872 | 77.8% |
| CHC VI | 1,923 | 1,541 | 80.1% |
| **Criminal History Points** | | | |
| 0 | 10,600 | 3,196 | 30.2% |
| 1 | 2,973 | 1,394 | 46.9% |
| 2 | 1,251 | 701 | 56.0% |
| 3 | 1,838 | 969 | 52.7% |
| 4 | 1,361 | 809 | 59.4% |
| 5 | 1,041 | 659 | 63.3% |
| 6 | 1,277 | 853 | 66.8% |
| 7 | 693 | 493 | 71.1% |
| 8 | 741 | 548 | 74.0% |
| 9 | 708 | 539 | 76.1% |
| 10 | 463 | 358 | 77.3% |
| More than 10 | 2,400 | 1,956 | 81.5% |
| **Career Offender/Armed Career Criminal Status** | | | |
| No Career Offender/Armed Career Criminal | 24,798 | 12,087 | 48.7% |
| Career Offender/Armed Career Criminal | 633 | 440 | 69.5% |

*Appendix A-1*

# Rearrest Rates Across Selected Variables

*Offense Level and Offense Type*

| | Total | N | % |
|---|---:|---:|---:|
| **Final Offense Level** | | | |
| 1 to 8 | 3,020 | 1,364 | 45.2% |
| 9 to 10 | 1,598 | 679 | 42.5% |
| 11 to 12 | 1,972 | 1,023 | 51.9% |
| 13 to 16 | 3,981 | 1,949 | 49.0% |
| 17 to 21 | 5,283 | 2,783 | 52.7% |
| 22 to 25 | 3,676 | 1,945 | 52.9% |
| 26 to 30 | 3,214 | 1,538 | 47.9% |
| 31 to 43 | 2,580 | 1,180 | 45.7% |
| **Federal Offense Type** | | | |
| Drug Trafficking | 10,591 | 5,288 | 49.9% |
| Firearms | 3,244 | 2,216 | 68.3% |
| Fraud | 3,450 | 1,181 | 34.2% |
| Robbery | 1,100 | 740 | 67.3% |
| Larceny | 994 | 441 | 44.4% |
| Immigration | 891 | 496 | 55.7% |
| All Other | 5,159 | 2,165 | 42.0% |

*Appendix A-1*

# Rearrest Rates Across Selected Variables

*Offense Characteristics*

| | Total | N | % |
|---|---:|---:|---:|
| **Weapon Enhancement** | | | |
| No Weapon Enhancement | 22,932 | 11,143 | 48.6% |
| Weapon Enhancement | 2,499 | 1,384 | 55.4% |
| **Aggravating Role** | | | |
| No Adjustment | 23,789 | 11,931 | 50.2% |
| +2 Levels | 872 | 325 | 37.3% |
| +3 Levels | 315 | 112 | 35.6% |
| +4 Levels | 439 | 148 | 33.7% |
| **Mitigating Role** | | | |
| No Adjustment | 22,726 | 11,287 | 49.7% |
| -2 Levels | 2,010 | 948 | 47.2% |
| -3 Levels | 232 | 87 | 37.5% |
| -4 Levels | 447 | 195 | 43.6% |
| **Acceptance of Responsibility** | | | |
| No Adjustment | 2,372 | 1,099 | 46.3% |
| -2 Levels | 7,297 | 3,403 | 46.6% |
| -3 Levels | 15,723 | 8,003 | 50.9% |

*Appendix A-1*

## Rearrest Rates Across Selected Variables

*Sentences Imposed*

| | Total | N | % |
|---|---:|---:|---:|
| **Sentence Type** | | | |
| Probation Only | 4,754 | 1,670 | 35.1% |
| Prison Only | 20,575 | 10,810 | 52.5% |
| **Length of Sentence** | | | |
| Up to 6 Months | 1,048 | 393 | 37.5% |
| 6 to 11 Months | 762 | 387 | 50.8% |
| 12 to 23 Months | 3,655 | 1,857 | 50.8% |
| 24 to 59 Months | 8,023 | 4,334 | 54.0% |
| 60 to 119 Months | 4,552 | 2,525 | 55.5% |
| 120 Months or More | 2,521 | 1,306 | 51.8% |
| **Sentence Relative to the Guideline Range** | | | |
| Within Range | 15,680 | 7,881 | 50.3% |
| Above Range | 197 | 117 | 59.4% |
| 5K1.1 Departure | 5,112 | 2,430 | 47.5% |
| Other Government Sponsored Below Range | 520 | 261 | 50.2% |
| Non-Government Sponsored Below Range | 2,134 | 964 | 45.2% |
| **Length of Supervised Release** | | | |
| No Supervised Release | 121 | 60 | 49.6% |
| Less than 2 Years | 627 | 307 | 49.0% |
| 2 Years | 1,736 | 813 | 46.8% |
| 3 Years | 11,097 | 6,149 | 55.4% |
| 4 Years | 1,793 | 864 | 48.2% |
| 5 to 9 Years | 5,068 | 2,559 | 50.5% |
| 10 or More Years | 124 | 53 | 42.7% |

*Appendix A-1*

## Rearrest Rates Across Selected Variables

*Offender Characteristics*

| | Total | N | % |
|---|---:|---:|---:|
| **Age at Sentencing** | | | |
| Younger than 21 | 1,226 | 872 | 71.1% |
| 21 to 25 | 4,737 | 3,105 | 65.6% |
| 26 to 30 | 4,746 | 2,755 | 58.1% |
| 31 to 35 | 3,895 | 1,984 | 50.9% |
| 36 to 40 | 3,347 | 1,587 | 47.4% |
| 41 to 50 | 4,569 | 1,639 | 35.9% |
| 51 to 60 | 2,125 | 462 | 21.7% |
| Older than 60 | 741 | 104 | 14.0% |
| **Age at Release** | | | |
| Younger than 21 | 398 | 269 | 67.6% |
| 21 to 25 | 2,986 | 1,984 | 66.4% |
| 26 to 30 | 4,325 | 2,692 | 62.2% |
| 31 to 35 | 4,584 | 2,533 | 55.3% |
| 36 to 40 | 3,762 | 1,834 | 48.8% |
| 41 to 50 | 5,551 | 2,353 | 42.4% |
| 51 to 60 | 2,732 | 675 | 24.7% |
| Older than 60 | 1,048 | 168 | 16.0% |
| **Gender** | | | |
| Male | 20,758 | 10,825 | 52.2% |
| Female | 4,664 | 1,696 | 36.4% |
| **Race/Ethnicity** | | | |
| White | 11,099 | 4,628 | 41.7% |
| Black | 8,617 | 5,089 | 59.1% |
| Hispanic | 4,512 | 2,213 | 49.1% |
| Other | 1,179 | 582 | 49.4% |
| **Level of Education** | | | |
| Less than High School | 8,656 | 5,230 | 60.4% |
| High School Graduate | 9,324 | 4,724 | 50.7% |
| Some College | 5,409 | 2,126 | 39.3% |
| College Graduate | 1,884 | 359 | 19.1% |

*Appendix A-1*

APPENDIX A-2

*Reconviction Rates Across Selected Variables*

**Reconviction Rates Across Selected Variables**

*Criminal History*

| | Total | N | % |
|---|---|---|---|
| **Total** | 25,431 | 8,062 | 31.7% |
| **Criminal History Category** | | | |
| CHC I | 13,581 | 2,701 | 19.9% |
| CHC II | 3,084 | 1,019 | 33.0% |
| CHC III | 3,616 | 1,494 | 41.3% |
| CHC IV | 1,996 | 1,030 | 51.6% |
| CHC V | 1,121 | 634 | 56.6% |
| CHC VI | 1,923 | 1,140 | 59.3% |
| **Criminal History Points** | | | |
| 0 | 10,600 | 1,844 | 17.4% |
| 1 | 2,973 | 856 | 28.8% |
| 2 | 1,251 | 432 | 34.5% |
| 3 | 1,838 | 587 | 31.9% |
| 4 | 1,361 | 530 | 38.9% |
| 5 | 1,041 | 435 | 41.8% |
| 6 | 1,277 | 543 | 42.5% |
| 7 | 693 | 320 | 46.2% |
| 8 | 741 | 385 | 52.0% |
| 9 | 708 | 377 | 53.3% |
| 10 | 463 | 246 | 53.1% |
| More than 10 | 2,400 | 1,473 | 61.4% |
| **Career Offender/Armed Career Criminal Status** | | | |
| No Career Offender/Armed Career Criminal | 24,798 | 7,761 | 31.3% |
| Career Offender/Armed Career Criminal | 633 | 301 | 47.6% |

## Reconviction Rates Across Selected Variables

*Offense Level and Offense Type*

| | Total | N | % |
|---|---:|---:|---:|
| **Final Offense Level** | | | |
| 1 to 8 | 3,020 | 898 | 29.7% |
| 9 to 10 | 1,598 | 437 | 27.4% |
| 11 to 12 | 1,972 | 688 | 34.9% |
| 13 to 16 | 3,981 | 1,291 | 32.4% |
| 17 to 21 | 5,283 | 1,843 | 34.9% |
| 22 to 25 | 3,676 | 1,217 | 33.1% |
| 26 to 30 | 3,214 | 943 | 29.3% |
| 31 to 43 | 2,580 | 704 | 27.3% |
| **Federal Offense Type** | | | |
| Drug Trafficking | 10,591 | 3,259 | 30.8% |
| Firearms | 3,244 | 1,541 | 47.5% |
| Fraud | 3,450 | 731 | 21.2% |
| Robbery | 1,100 | 501 | 45.6% |
| Larceny | 994 | 296 | 29.8% |
| Immigration | 891 | 336 | 37.7% |
| All Other | 5,159 | 1,398 | 27.1% |

*Appendix A-2*

### Reconviction Rates Across Selected Variables

*Offense Characteristics*

| | Total | N | % |
|---|---:|---:|---:|
| **Weapon Enhancement** | | | |
| No Weapon Enhancement | 22,932 | 7,177 | 31.3% |
| Weapon Enhancement | 2,499 | 885 | 35.4% |
| **Aggravating Role** | | | |
| No Adjustment | 23,789 | 7,704 | 32.4% |
| +2 Levels | 872 | 204 | 23.4% |
| +3 Levels | 315 | 68 | 21.6% |
| +4 Levels | 439 | 81 | 18.5% |
| **Mitigating Role** | | | |
| No Adjustment | 22,276 | 7,298 | 32.1% |
| -2 Levels | 2,010 | 587 | 29.2% |
| -3 Levels | 232 | 47 | 20.3% |
| -4 Levels | 447 | 125 | 28.0% |
| **Acceptance of Responsibility** | | | |
| No Adjustment | 2,372 | 661 | 27.9% |
| -2 Levels | 7,297 | 2,244 | 30.8% |
| -3 Levels | 15,723 | 5,143 | 32.7% |

*Appendix A-2*

**Reconviction Rates Across Selected Variables**

*Sentences Imposed*

|  | Total | N | % |
|---|---|---|---|
| **Sentence Type** | | | |
| Probation Only | 4,754 | 1,028 | 21.6% |
| Prison Only | 20,575 | 7,007 | 34.1% |
| **Length of Sentence** | | | |
| Up to 6 Months | 1,048 | 246 | 23.5% |
| 6 to 11 Months | 762 | 243 | 31.9% |
| 12 to 23 Months | 3,655 | 1,239 | 33.9% |
| 24 to 59 Months | 8,023 | 2,840 | 35.4% |
| 60 to 119 Months | 4,552 | 1,613 | 35.4% |
| 120 Months or More | 2,521 | 819 | 32.5% |
| **Sentence Relative to the Guideline Range** | | | |
| Within Range | 15,680 | 5,115 | 32.6% |
| Above Range | 197 | 88 | 44.7% |
| 5K1.1 Departure | 5,112 | 1,526 | 29.9% |
| Other Government Sponsored Below Range | 520 | 168 | 32.3% |
| Non-Government Sponsored Below Range | 2,134 | 602 | 28.2% |
| **Length of Supervised Release** | | | |
| No Supervised Release | 121 | 41 | 33.9% |
| Less than 2 Years | 627 | 188 | 30.0% |
| 2 Years | 1,736 | 533 | 30.7% |
| 3 Years | 11,097 | 4,130 | 37.2% |
| 4 Years | 1,793 | 524 | 29.2% |
| 5 to 9 Years | 5,068 | 1,558 | 30.7% |
| 10 or More Years | 124 | 30 | 24.2% |

**Reconviction Rates Across Selected Variables**

*Offender Characteristics*

| | Total | N | % |
|---|---|---|---|
| **Age at Sentencing** | | | |
| Younger than 21 | 1,226 | 635 | 51.8% |
| 21 to 25 | 4,737 | 2,128 | 44.9% |
| 26 to 30 | 4,746 | 1,764 | 37.2% |
| 31 to 35 | 3,895 | 1,290 | 33.1% |
| 36 to 40 | 3,347 | 989 | 29.6% |
| 41 to 50 | 4,569 | 931 | 20.4% |
| 51 to 60 | 2,125 | 253 | 11.9% |
| Older than 60 | 741 | 59 | 8.0% |
| **Age at Release** | | | |
| Younger than 21 | 398 | 193 | 48.5% |
| 21 to 25 | 2,986 | 1,424 | 47.7% |
| 26 to 30 | 4,325 | 1,779 | 41.1% |
| 31 to 35 | 4,584 | 1,614 | 35.2% |
| 36 to 40 | 3,762 | 1,151 | 30.6% |
| 41 to 50 | 5,551 | 1,428 | 25.7% |
| 51 to 60 | 2,732 | 366 | 13.4% |
| Older than 60 | 1,048 | 94 | 9.0% |
| **Gender** | | | |
| Male | 20,758 | 7,022 | 33.8% |
| Female | 4,664 | 1,035 | 22.2% |
| **Race/Ethnicity** | | | |
| White | 11,099 | 2,999 | 27.0% |
| Black | 8,617 | 3,237 | 37.6% |
| Hispanic | 4,512 | 1,409 | 31.2% |
| Other | 1,179 | 408 | 34.6% |
| **Level of Education** | | | |
| Less than High School | 8,656 | 3,484 | 40.3% |
| High School Graduate | 9,324 | 3,041 | 32.6% |
| Some College | 5,409 | 1,279 | 23.7% |
| College Graduate | 1,884 | 196 | 10.4% |

*Appendix A-2*

APPENDIX A-3

*Reincarceration Rates Across Selected Variables*

## Reincarceration Rates Across Selected Variables

*Criminal History*

|  | Total | N | % |
|---|---:|---:|---:|
| **Total** | 25,431 | 6,266 | 24.6% |
| **Criminal History Category** | | | |
| CHC I | 13,581 | 1,897 | 14.0% |
| CHC II | 3,084 | 737 | 23.9% |
| CHC III | 3,616 | 1,189 | 32.9% |
| CHC IV | 1,996 | 868 | 43.5% |
| CHC V | 1,121 | 554 | 49.4% |
| CHC V | 1,923 | 986 | 51.3% |
| **Criminal History Points** | | | |
| 0 | 10,600 | 1,296 | 12.2% |
| 1 | 2,973 | 600 | 20.2% |
| 2 | 1,251 | 303 | 24.2% |
| 3 | 1,838 | 434 | 23.6% |
| 4 | 1,361 | 401 | 29.5% |
| 5 | 1,041 | 355 | 34.1% |
| 6 | 1,277 | 442 | 34.6% |
| 7 | 693 | 263 | 38.0% |
| 8 | 741 | 322 | 43.5% |
| 9 | 708 | 326 | 46.1% |
| 10 | 463 | 215 | 46.4% |
| More than 10 | 2,400 | 1,281 | 53.4% |
| **Career Offender/Armed Career Criminal Status** | | | |
| No Career Offender/Armed Career Criminal | 24,798 | 6,012 | 24.2% |
| Career Offender/Armed Career Criminal | 633 | 254 | 40.1% |

*Appendix A-3*

## Reincarceration Rates Across Selected Variables

*Offense Level and Offense Type*

|  | Total | N | % |
|---|---|---|---|
| **Final Offense Level** | | | |
| 1 to 8 | 3,020 | 631 | 20.9% |
| 9 to 10 | 1,598 | 320 | 20.0% |
| 11 to 12 | 1,972 | 536 | 27.2% |
| 13 to 16 | 3,981 | 1,034 | 26.0% |
| 17 to 21 | 5,283 | 1,488 | 28.2% |
| 22 to 25 | 3,676 | 934 | 25.4% |
| 26 to 30 | 3,214 | 744 | 23.2% |
| 31 to 43 | 2,580 | 546 | 21.2% |
| **Federal Offense Type** | | | |
| Drug Trafficking | 10,591 | 2,475 | 23.4% |
| Firearms | 3,244 | 1,258 | 38.8% |
| Fraud | 3,450 | 514 | 14.9% |
| Robbery | 1,100 | 443 | 40.3% |
| Larceny | 994 | 225 | 22.6% |
| Immigration | 891 | 272 | 30.5% |
| All Other | 5,159 | 1,079 | 20.9% |

*Appendix A-3*

**Reincarceration Rates Across Selected Variables**

*Offense Characteristics*

| | Total | N | % |
|---|---:|---:|---:|
| **Weapon Enhancement** | | | |
| No Weapon Enhancement | 22,932 | 5,550 | 24.2% |
| Weapon Enhancement | 2,499 | 716 | 28.7% |
| **Aggravating Role** | | | |
| No Adjustment | 23,789 | 5,994 | 25.2% |
| +2 Levels | 872 | 154 | 17.7% |
| +3 Levels | 315 | 46 | 14.6% |
| +4 Levels | 439 | 67 | 15.3% |
| **Mitigating Role** | | | |
| No Adjustment | 22,276 | 5,693 | 25.1% |
| -2 Levels | 2,010 | 442 | 22.0% |
| -3 Levels | 232 | 34 | 14.7% |
| -4 Levels | 447 | 92 | 20.6% |
| **Acceptance of Responsibility** | | | |
| No Adjustment | 2,372 | 524 | 22.1% |
| -2 Levels | 7,297 | 1,664 | 22.8% |
| -3 Levels | 15,723 | 4,066 | 25.9% |

*Appendix A-3*

**Reincarceration Rates Across Selected Variables**

*Sentences Imposed*

|  | Total | N | % |
|---|---:|---:|---:|
| **Sentence Type** | | | |
| Probation | 4,754 | 624 | 13.1% |
| Prison | 20,575 | 5,620 | 27.3% |
| **Length of Sentence** | | | |
| Up to 6 Months | 1,048 | 169 | 16.1% |
| 6 to 11 Months | 762 | 180 | 23.6% |
| 12 to 23 Months | 3,655 | 1,015 | 27.8% |
| 24 to 59 Months | 8,023 | 2,293 | 28.6% |
| 60 to 119 Months | 4,552 | 1,283 | 28.2% |
| 120 Months or More | 2,521 | 676 | 26.8% |
| **Sentence Relative to the Guideline Range** | | | |
| Within Range | 15,680 | 4,021 | 25.6% |
| Above Range | 197 | 83 | 42.1% |
| 5K1.1 Departure | 5,112 | 1,132 | 22.1% |
| Other Government Sponsored Below Range | 520 | 137 | 26.4% |
| Non-Government Sponsored Below Range | 2,134 | 460 | 21.6% |
| **Length of Supervised Release** | | | |
| No Supervised Release | 121 | 35 | 28.9% |
| Less than 2 Years | 627 | 144 | 23.0% |
| 2 Years | 1,736 | 421 | 24.3% |
| 3 Years | 11,097 | 3,361 | 30.3% |
| 4 Years | 1,793 | 396 | 22.1% |
| 5 to 9 Years | 5,068 | 1,242 | 24.5% |
| 10 or More Years | 124 | 19 | 15.3% |

*Appendix A-3*

## Reincarceration Rates Across Selected Variables

*Offender Characteristics*

| | Total | N | % |
|---|---:|---:|---:|
| **Age at Sentencing** | | | |
| Younger than 21 | 1,226 | 528 | 43.1% |
| 21 to 25 | 4,737 | 1,679 | 35.4% |
| 26 to 30 | 4,746 | 1,382 | 29.1% |
| 31 to 35 | 3,895 | 994 | 25.5% |
| 36 to 40 | 3,347 | 738 | 22.1% |
| 41 to 50 | 4,569 | 707 | 15.5% |
| 51 to 60 | 2,125 | 187 | 8.8% |
| Older than 60 | 741 | 42 | 5.7% |
| **Age at Release** | | | |
| Younger than 21 | 398 | 142 | 35.7% |
| 21 to 25 | 2,986 | 1,137 | 38.1% |
| 26 to 30 | 4,325 | 1,392 | 32.2% |
| 31 to 35 | 4,584 | 1,246 | 27.2% |
| 36 to 40 | 3,762 | 882 | 23.4% |
| 41 to 50 | 5,551 | 1,108 | 20.0% |
| 51 to 60 | 2,732 | 281 | 10.3% |
| Older than 60 | 1,048 | 69 | 6.6% |
| **Gender** | | | |
| Male | 20,758 | 5,560 | 26.8% |
| Female | 4,664 | 703 | 15.1% |
| **Race/Ethnicity** | | | |
| White | 11,099 | 2,266 | 20.4% |
| Black | 8,617 | 2,531 | 29.4% |
| Hispanic | 4,512 | 1,111 | 24.6% |
| Other | 1,179 | 351 | 29.8% |
| **Level of Education** | | | |
| Less than High School | 8,656 | 2,809 | 32.5% |
| High School Graduate | 9,324 | 2,344 | 25.1% |
| Some College | 5,409 | 929 | 17.2% |
| College Graduate | 1,884 | 134 | 7.1% |

*Appendix A-3*

APPENDIX B

*Data Collection and Analysis Process*

## Appendix B: Overview

Previous Commission recidivism studies required manual coding of criminal records from state and federal criminal history records (*i.e.*, RAP sheets). This project has used technological advances to greatly expand the number of federal offender records analyzed as compared to previous Commission studies by collecting RAP sheets electronically. This appendix describes this data collection and analysis process.

The Commission entered into a data sharing agreement with the FBI's Criminal Justice Information Services (CJIS) Division and the Administrative Office of the United States Courts (AO) to provide the Commission with secure electronic access to criminal history records through the CJIS's Interstate Identification Index (III) and the International Justice and Public Safety Network (NLETS). Results received using this system provide an individual's criminal history record maintained by all U.S. states, the District of Columbia, and federal agencies.[1] Once automated records were obtained, the Commission went through an extensive process to organize and standardize offense and court disposition descriptions across all reporting agencies with the assistance of NORC at the University of Chicago (NORC). The resulting database contained 30,182 offenders who had valid identifying information and were released during the study period, which included primarily calendar year 2005 (25,431 offenders) but was extended before and after this year to expand the sample for certain subgroups of offenders (4,751 offenders). This process, described below, began in 2014 and the database was completed in August 2015.

### *Collecting the Study Group from Commission and Other Records*

Identifying information, including FBI numbers required by the NLETS system, was collected on 36,007 offenders from Commission, Federal Bureau of Prisons (BOP), and AO sources. The primary study cohort includes all federal offenders who were either released from federal prison after serving a sentence of imprisonment or were placed on probation in 2005. For offenders released from prison, the BOP provided release dates, identifying information, some reincarceration information, and other relevant information which allowed the Commission to identify offenders who could not be reliably studied (*e.g.*, those who died while incarcerated). For offenders placed on probation, the AO provided identifying information, some revocation information, and other relevant information (*e.g.*, death while under supervision).

Criminal history records were also drawn for two secondary offender groups for inclusion in possible future studies. The first group selected for additional collection was citizen offenders sentenced under USSG §4B1.1 (Career Offenders) and §4B1.4 (Armed Career Criminals) re-entering the community in calendar years 2004 and 2006 (in addition to those already included in the 2005 cohort). The second group included additional citizen offenders whose guideline calculations placed them in Zones B or C of the Sentencing Table.[2] In addition to those offenders in Zones B and C who reentered during the 2005 study period, these additional offenders expanded the reentry period to include those reentering the community from May 1, 2003 (beginning of the PROTECT Act period)[3] through calendar year 2006. The purpose of expanding the initial study group in this way was to increase the number of offenders eligible for probation or a shorter incarcerative sentence.

### *Processing the Criminal Records*

Following a practice pioneered by the U.S. Department of Justice's Bureau of Justice Statistics (BJS),[4] the Commission entered into a data sharing agreement with the FBI's CJIS Division and the Administrative Office of the United States Courts to provide the Commission with electronic access to criminal history records through the CJIS's Interstate Identification Index (III) using secure data exchange, which protected these confidential records from inadvertent disclosure. The CJIS's III allows authorized agencies to determine whether any federal or state repository has criminal history records on an individual. When an offender's records were found, each central criminal records repository, responding to III requests over the NLETS network, provided the records via the Administrative Office's Access to Law Enforcement System (ATLAS) secure interface to the Commission. As a result, offender criminal history records were collected from all state and federal agencies in which those records resided.

The ATLAS system returns the literal text in the RAP sheets in the format in which the original records appear: dates of criminal justice system actions (*e.g.*, arrests); offense categories which indicate the charges in the terminology used by that agency (*e.g.*, text strings or numeric categories); subsequent action tied to arrest charges (*e.g.*, charges filed by prosecutors, court findings of guilt, etc.); and sentencing and corrections information. All of these records are subject to availability from the originating source.

The ATLAS system also "parses" records from RAP sheets received from all the states, the District of Columbia, and federal agencies. Parsing records involves organizing key data elements into logical components: sorting into separate criminal justice system stages (arrest, court, and correctional events); organizing all records by date; and linking related elements (such as court action taken in response to an arrest) into a single cycle. Key data elements include offender identifiers, dates of key actions (such as arrests and convictions), the criminal charges, and outcomes such as convictions and sentencing information. The parsing process collates the multi-state records into a uniform structure, regardless of the state, and produces a database for all individuals with a valid FBI number who were found in one or more repositories across the country.

The initial extraction process began in September 2014 and was completed in April 2015. Commission staff examined the raw RAP sheet information and compared it to the parsed records, looking for missing or erroneous translation of information from its raw form to the parsed record. This step is important because criminal history record repositories are continually updating and improving their information systems in ways that change the location or format of key text strings, making software written for an earlier computer platform obsolete for purposes of accurately parsing the data in its intended format and detail. Commission staff worked with ATLAS staff to resolve possible issues in about one-half of the repositories, and as a result records for several state repositories had to be reprocessed after changes to the parsing procedures. In April 2015, this process was complete.

### Standardizing the Criminal Records

Following the collection of the RAP sheet records on study group offenders, the Commission contracted with NORC to consolidate all records on each offender, organize the records chronologically, and remove duplicative or extraneous material.[5] Minor traffic offenses (*e.g.*, speeding) were removed, but serious traffic-related offenses (*e.g.*, driving while intoxicated) were not removed from the analysis. Following these preliminary process steps, NORC researched state and federal criminal codes and repository data definitions to assign each unique state offense and disposition description to a single uniform description. This step was needed because criminal records repositories are primarily designed to store their records in ways that accurately reflect the requirements of each state or federal repository, such as the criminal code for

that jurisdiction. As a result, any two repositories are likely to use many unique text strings to indicate the nature of the criminal charges and actions taken in response to those charges. Each jurisdiction's information was standardized by NORC for national-level analysis that reflected common definitions.

Using research on each repository, NORC created separate offense "crosswalks" for every state and the District of Columbia, as well as a separate crosswalk for federal repository records. These crosswalks translate any given jurisdiction's arrest and court records into standardized arrest and court codes. Through this standardization, all records, regardless of originating source, were brought into a common framework.

Within each arrest and court cycle, arrest and disposition of charges were categorized using standardized coding which generally follows the BJS model.[6] A charge severity index was created which incorporates both criminal law classification (*e.g.*, felony or misdemeanor) and offense severity. Offense severity was first separated into four broad categories (violent, property, drug, and public order), and then into 16 major arrest charge codes[7] and 98 detailed arrest charge codes used by BJS.[8] The charge severity index ranks murder of a public officer as the most serious charge, followed by 26 other detailed violent charge codes. These detailed violent charge codes are followed in order of severity by five drug trafficking, 16 property, 10 other drug, and 40 public order detailed charge codes. Additionally, court events are coded for charge disposition. After ordering, each charge is assigned a sequence number, and the top three for each event are retained.

Finally, by assembling all federal and state records, the database provides a complete criminal record for all individuals for which valid records could be found, across any jurisdiction maintaining data on that individual. After the receipt of data from NORC, the Commission again reviewed all records for completeness and questionable entries. From the 36,007 offender records initially processed through ATLAS, 1,812 records were eliminated for reasons including apparent death during the study period, missing criminal history records, and missing or suspect information as to United States citizenship. Additionally, 4,013 offenders were released from BOP on detainer, which ordinarily indicates transfer of custody to state court or transfer to a state correctional facility following completion of their federal sentence. These detained offenders were not released into the community during the study period, and their whereabouts are not recorded in the data; therefore, they were also withheld from the study. Over thirty thousand (30,182) usable records remained for analysis.

*Appendix B*

[1]  Of the 262,284 arrest records processed for 2005 releases, these records were almost entirely U.S. state and federal records.  However, also included are 345 (0.1%) territorial (non-federal) arrests provided by U.S. territories, primarily by Puerto Rico and the U.S. Virgin Islands.

[2]  The guidelines sentencing table provides sentencing ranges based on an offender's offense level and Criminal History Category.  *See* USSG, Ch.5 Pt.A.  The offense level is calculated using offense specific aggravating and mitigating factors prescribed by the guidelines.  *See* USSG §1B1.1(a)(1)-(5).  The Criminal History Category is based on the recency and severity of an offender's prior sentences and supervision status.  *See* USSG §4A1.1.  The sentencing range is determined by "[t]he intersection of the Offense Level and Criminal History Category" on the sentencing table.  USSG, Ch.5 Pt.A, comment. (n.1).  The sentencing table is subdivided into four zones (A, B, C, and D) that determine confinement options for each sentencing range.  Zone B authorizes probation with condition of community confinement (*e.g.*, home detention) and Zone C authorizes a "split" sentence of imprisonment and community confinement.  USSG §§5B1.1(a)(2), 5C1.1(d)(2).

[3]  In 2003, Congress enacted the Prosecutorial Remedies and Other Tools to end the Exploitation of Children Today Act ("the PROTECT Act"), Pub. L. No. 108-21 (2003), which restricted the use of departures by sentencing courts and changed the appellate standard of review for cases in which departures were imposed.  The PROTECT Act restricted the availability of departures.  The PROTECT Act period began May 1, 2003.

[4]  *See* MATTHEW DUROSE, ALEXIA COOPER & HOWARD SNYDER, BUREAU OF JUSTICE STATISTICS, RECIDIVISM OF PRISONERS RELEASED IN 30 STATES IN 2005: PATTERNS FROM 2005 TO 2010 (2014) (hereinafter PRISONERS RELEASED IN 30 STATES IN 2005), http://www.bjs.gov/content/pub/pdf/rprts05p0510.pdf.

[5]  Instances of arrest or sentencing that appeared to be duplicates of existing events were removed by NORC.  Certain administrative records were removed after review of each state's procedures demonstrated that some entries were likely to be either reports of non-offending contact with law enforcement (*e.g.*, registration as a sex offender) or other information that pertained to the offender but was not a criminal justice event.  Some states included historical data within cycles which caused issues with correct parsing of criminal history information; in these cases, the first court disposition for that cycle was retained and all others removed.  Arrest entries that occurred outside of the eight-year follow-up period were removed from the datafiles and were not used to ascertain recidivism.

[6]  *See* PRISONERS RELEASED IN 30 STATES IN 2005, *supra* note 4, at 22.

[7]  The major arrest charge codes, as ranked by the Commission beginning with the most serious, were homicide, rape or sexual assault, robbery, assault, other violent offense, drug trafficking, burglary, larceny, motor vehicle theft, fraud, other property offense, drug possession, other drug offense, weapons offense (*e.g.*, unlawful sale, etc.), driving under the influence, and other public order offense.

[8]  However, unlike the BJS major and detailed charge code rankings, the Commission chose to rank drug trafficking offenses immediately behind violent offenses in order of severity.

*Appendix B*