UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

                         CASE NO. 8:24-cr-00156-TPB-NHA

v.

                         Honorable Stephen J. Murphy, III

JOEL RUFUS FRENCH

## THE UNITED STATES' SENTENCING MEMORANDUM

The United States of America, by and through undersigned counsel, respectfully submits this sentencing memorandum in the above-captioned matter to respond to Defendant's objections to the presentence investigation report ("PSR"), Dkt. 185, and Defendant's sentencing memorandum, Dkt. 184, and to recommend a sentence for Defendant. As discussed below, the PSR accurately reflects the applicable Sentencing Guidelines, resulting in Guidelines of life in prison capped by the combined 35-year statutory maximum for Defendant's crimes. The factors set forth in 18 U.S.C. § 3553(a) do not warrant a departure from the Guidelines. Nevertheless, the Government recommends that the Court impose concurrent sentences for Defendant's crimes, which results in a term of 20 years in prison.

## I.    PROCEDURAL AND FACTUAL BACKGROUND

On February 3, 2026, Defendant was convicted of committing one count of conspiracy to pay and receive kickbacks (Count 1), one count of conspiracy to commit health care fraud and wire fraud (Count 2), and one count of conspiracy to commit money laundering (Count 3). Defendant's conviction followed six days of trial, during

1

which the Government proved beyond a reasonable doubt that Defendant conspired to submit and cause the submission of over $197 million in false and fraudulent claims to Medicare and CHAMPVA. The evidence, introduced through two program witnesses, a medical expert, a forensic accountant, nine of Defendant's co-conspirators, and the family members of five deceased beneficiaries and hundreds of exhibits, proved that unlike the typical defendant in these schemes, Defendant was involved in every aspect of it: (1) purchasing the personal and health information of beneficiaries, *e.g.*, Day 2 Tr. at 254[1]; (2) directing an Indian call center to target those beneficiaries, *e.g.*, Day 4 Tr. at 29-30; (3) paying illegal kickbacks to purported telemedicine companies to generate the fake doctors' orders for medically unnecessary braces, *e.g.*, Day 2 Tr. at 158-59; (4) selling over $162 million dollars of those doctors' orders, *e.g.*, Gov. Exh. 53; (5) setting up and controlling eight durable medical equipment ("DME") companies with straw owners, *e.g.*, Day 4 Tr. at 11-13; and (6) billing Medicare directly using the medically unnecessary orders Defendant generated, including billing for thousands of Medicare beneficiaries to each receive 6 or more braces at one time, *e.g.*, Gov. Exhs. 1, 6. As a result, Defendant and his co-conspirators targeted and used the identities of Medicare beneficiaries from every state in the country, including deceased beneficiaries and amputees, to steal over $110 million from Medicare and CHAMPVA. *E.g.*, Gov. Exhs. 1, 6, 53, 54.

The Government further proved that, after learning that a co-conspirator had

---

[1] All trial transcript citations from this matter are to the daily transcripts provided during the trial.

their bank accounts frozen and his bank accounts would be frozen, Defendant transferred millions of dollars out of his fraudulent businesses, including hundreds of thousands of dollars to a business in his wife's name and withdrew $225,000 in cash from fraudulent proceeds. *E.g.*, Day 4 Tr. at 148-52 (Gorman); Gov. Exh. 1227. He used over $10,000 of that cash to pay off co-conspirators in Florida. *E.g.*, Day 2 Tr. at 259 (Moranz). Defendant also directed a co-conspirator to destroy records of all the doctors' orders that Defendant generated and sold to another co-conspirator over the course of the scheme. *E.g.*, Day 2 Tr. at 169 (Parker).

II.    **THE PSR'S GUIDELINES CALCULATION IS ACCURRATE.**

The PSR accurately calculates Defendant's Sentencing Guidelines offense level as follows:

| | |
|---|---|
| Base Offense level (U.S.S.G. §§ 2S1.1(a)(1), 2B1.1(a)(1)) | 7 |
| Loss Amount (§ 2B1.1(b)(1)(N)) | +26 |
| Mass Marketing (§ 2B1.1(b)(2)(A)(ii)) | +2 |
| Federal Health Care Offense (§ 2B1.1(b)(7)(iii)) | +4 |
| Sophisticated Means (§ 2B1.1(b)(10)(C)) | +2 |
| 18 U.S.C. § 1957 (§ 2S1.1(b)(2)(A)) | +1 |
| Role in the Offense (§ 3B1.1.(a)) | +4 |
| Obstruction of Justice (§ 3C1.1) | +2 |
| **Total Offense Level** | **48** |

Defendant's Guidelines offense level calculation of 48 exceeds the Guidelines' 43-point maximum. Accordingly, his offense level is lowered to 43, which provides for a sentence of life imprisonment. Because the three charges for which Defendant was convicted provide for a statutory maximum of 35 years if applied consecutively, Defendant's Sentencing Guidelines range is 35 years of imprisonment.

Defendant objects to the PSR's Guideline calculations based on (1) the applicability of the organizer/leader and obstruction of justice enhancements; (2) the applicability of the sophisticated means enhancement; and (3) the PSR's failure to identify factors warranting a sentence outside the applicable Guidelines range.[2] Dkt. 184 at 3; Dkt. 185 at 27-29 (Defendant's Objections to PSR). Defendant concedes that none of these objections impact the ultimate Sentencing Guidelines range he faces. Dkt. 184 at 3. His objections are without merit and should be overruled. As discussed in the PSR and below, the bases for these enhancements were proven at length through witness testimony and documentary evidence over the course of the trial.

### A. Defendant Organized and Led the Fraud Scheme and Obstructed and Impeded the Administration of Justice.

Defendant objects to the organizer/leader and obstruction enhancements, lodged as a single objection, but does not explain the basis for the objections. *See* Dkt. 185 at 28. The PSR accurately applied the Guideline enhancements for organizing or leading a criminal activity, USSG § 3B1.1(a), and obstructing or impeding the administration of justice, U.S.S.G. § 3C1.1, based on the evidence presented at trial.

As to role, "[f]or the four-level enhancement to apply, the government must

---

[2]  Defendant also objects to the PSR's characterization of Defendant's participation in the drafting of PSR. The Government does not take a position on whether and to what extent Defendant participated in Probation's presentence investigation. The Government understands that Defendant initially declined to participate in the presentence interview, but after Probation issued the PSR, Defendant allowed Probation to conduct an interview. Whether and to what extent Defendant participated in the presentence investigation had no bearing on Probation's calculation of the applicable Sentencing Guidelines range.

show that: (1) the defendant's role rose to the level of being an organizer or leader; and (2) the conspiracy involved five or more people or was otherwise extensive." *United States v. Valadez*, 415 F. App'x 996, 997 (11th Cir. 2011) (citing *United States v. Martinez*, 584 F.3d 1022, 1026 (11th Cir. 2009)). As to the first prong, courts consider several factors including "(1) the exercise of decision making authority, (2) the nature of participation in the commission of the offense, (3) the recruitment of accomplices, (4) the claimed right to a larger share of the fruits of the crime, (5) the degree of participation in planning or organizing the offense, (6) the nature and scope of the illegal activity, and (7) the degree of control and authority exercised over others.". *United States v. Gupta*, 463 F.3d 1182, 1198 (11th Cir. 2006) (quoting U.S.S.G. § 3B1.1 cmt. n.4). The evidence presented at trial establishes both prongs of the enhancement.

First, Defendant had a leader and organizer role. Defendant's co-conspirators testified at trial that Defendant led and organized all phases of each of the three counts of the fraud scheme: (1) obtaining beneficiary information, (2) generating fake doctors' orders, (3) buying and selling those orders, (4) hiding his role in DME companies and using them to bill Medicare, and (5) laundering money when the co-conspirators got caught. He was the owner and operator of the marketing companies and eight DME companies at the heart of the scheme. *E.g.*, Ex. 56; Day 3 Tr. at 23-24; Day 4 Tr. at 11-13. He recruited others to the scheme, including the straw owners whose names were placed on DME paperwork. Day 3 Tr. at 24. Indeed, Charlene Frame testified that she would not have been involved if not for Defendant and opened up her sham telemedicine company at his suggestion. Day 4 Tr. at 100. Bank records reflect that his

companies, R&L Marketing and Restorative, received over $68 million in illegal payments, Gov. Exhs. 44, 46, and that Defendant spent millions of those funds for his personal use, Gov. Exh. 48. Defendant directed the money laundering conspiracy. He contacted Michael Moranz about moving the money, determined how much money would be withdrawn from the bank and put in the bag to be transported, determined the transfer location, and arranged for the money to be brought to Orlando. *E.g.*, Day 2 Tr. 258-59 (Moranz); Day 3 Tr. 85-86 (Chibnick); Day 4 Tr. 152 (Gorman).

Second, the evidence presented throughout trial establishes that Defendant organized and led a criminal activity that involved five or more participants or was otherwise extensive. Consistent with the PSR's findings, the conspiracy had a large number of participants, including but not limited to the nine cooperating individuals who testified at trial about their roles in the underlying wire fraud, health care fraud, and kickback conspiracies, such as Ardalaan Adams, Brandy McKay, Frame, David Laughlin, Jr., Jordan Chibnick, Kelly Wolfe, Moranz, Steven Parker, and Steven Richardson. This testimony was further supported by the evidence at trial. For example, bank records show that Defendant paid millions of dollars in illegal kickbacks to testifying co-conspirators Richardson (Expansion Media), Moranz, Chibnick, and their co-owner Jordan Karlick (Mojo Media LLC), Laughlin and his co-owner Stephen Luke (RediDoc LLC), and Frame (Envision It Perfect). Gov Exhs. 47, 55. Bank records also show Defendant sold over $27 million in fake doctors' orders to testifying co-conspirator Parker, who in turn sold them to Adams and his co-owner Charles Burruss, and sold doctors' orders to a number of other entities. Gov. Exh. 46

6

(select R&L and Restorative revenue). Five or more individuals also were involved in the movement of money for the money laundering conspiracy: Defendant; the three principals of Mojo Media, Moranz, Jordan Chibnick, and Jordan Karlick; and the two individuals who transported the funds, Andrew Gillbody and Rodney Gabriel.

The evidence also established that Defendant directed one or more participants in the conspiracy. As the PSR identifies, over the course of the conspiracies, Defendant supervised at least nine individuals as part of the underlying offenses, including the operator of the Indian call center (Sushil Singh), four different straw owners of Defendant's DME companies (Jamie McCoy, Curtis French, Marcus Moon, Jackson P. Siples III, and Terrance French), and individuals who did work for R&L Marketing (Lateese Ford and Brandy McKay). *E.g.*, Day 1 Tr. at 97; Day 2 Tr. at 176-77; Day 3 Tr. at 23-24, 26, 28; Day 4 Tr. at 8, 11-13; Gov. Exhs. 43, 116 at 20. He also directed Rodney Gabriel to drive the money to Orlando as part of the money laundering conspiracy. Day 2 Tr. at 258-59.

As for the obstruction enhancement, the evidence established that Defendant willfully obstructed and impeded the administration of justice, thereby satisfying U.S.S.G. § 3C1.1. "A defendant is subject to enhancement of his sentence if he 'willfully obstructs or impedes, or attempts to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction.'" *United States v. Williams*, 627 F.3d 839, 845 (11th Cir. 2010) (quoting U.S.S.G. § 3C1.1) (alterations omitted). "The enhancement is applicable if a defendant commits perjury." *Id.* (citing U.S.S.G. § 3C1.1 cmt. n.4(B)). To find

obstruction based on perjury, the Court must make "an independent factual finding that the defendant willfully lied in trial testimony." *United States v. Husky*, 924 F.2d 223, 224 (11th Cir. 1991). "Perjury occurs when a witness, testifying under oath, 'gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory.'" *United States v. Wallace*, 425 F. App'x 841, 842 (11th Cir. 2011) (citing *United States v. Dunnigan*, 507 U.S. 87, 94–95 (1993)). For section 3C1.1 purposes, material matters are those that "if believed, would tend to influence or affect the issue under determination." U.S.S.G. §3C1.1 cmt. n.6.

Here, immediately after learning of the investigation into his companies, Defendant moved millions of dollars in fraud proceeds through accounts he controlled. *E.g.*, Day 4 Tr. at 148-52 (Gorman); Gov. Exh. 1227. He also instructed his right-hand man Sushil Singh to destroy fraudulent doctors' orders that Defendant sold to one of his intermediaries, Parker. Parker testified that, according to Singh, "Joel French had him destroy all the drop box files that he sent me, all the copies they had of the drop box files [of] him sending me the doctors' orders over the period of a year-and-a-half or so, almost two years." Day 2 Tr. at 169 (Parker). Concealing and destroying evidence are classic forms of obstructing justice and among the examples of covered conduct under U.S.S.G. § 3C1.1. *See* U.S.S.G. § 3C1.1, n. 4(B).

Defendant's efforts to impede the administration of justice continued through trial, where Defendant proffered false testimony that went to right to heart of the elements of crimes of conviction. Defendant testified, for example, that he did not

know about the fraud and that he was never warned of it by his co-conspirators. *E.g.*, Day 6 Tr. at 22-25. This testimony is contradicted by documents and testimony by co-conspirators, including Laughlin, Parker, and Richardson, that they specifically told Defendant in email, by phone, and in person about customer complaints and problems with the way Defendant was running his business. *E.g.*, Day 2 Tr. at 19, 28, 87, 91-92, 168-69, 237; Day 3 Tr. at 148-49. The jury rejected Defendant's testimony, credited contradictory evidence, and convicted him of knowingly and willfully committing the crimes charged. Defendant's perjured testimony was directly tied to the elements of these crimes, and, if believed, would have had a tendency to influence the jury's verdict and serves as an independent basis to support the PSR's obstruction enhancement. *See, e.g.*, *United States v. Farley*, 607 F.3d 1294, 1336 n.27 (11th Cir. 2010) (observing that the record fully supported an obstruction enhancement because the defendant gave false testimony that went to an element of the offense); *United States v. Williams*, 627 F.3d 839, 845 (11th Cir. 2010) ("The enhancement is applicable if a defendant commits perjury[.]" (citing U.S.S.G. § 3C1.1 cmt. n.4(B))).

### B. Evidence Presented at Trial Established that Defendant Used Sophisticated Means to Defraud Medicare and CHAMPVA.

The sophisticated means enhancement applies when an offense "involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means . . . ." U.S.S.G. § 2B1.1(b)(10)(c). For example, in *United States v. Moran*, 778 F.3d 942 (11th Cir. 2015), the Eleventh Circuit upheld the application of the sophisticated means enhancement where "[t]he offense involved the

widespread use of kickbacks, the falsification of group therapy notes, and the laundering of proceeds from the fraud." *Id.* at 977.

Consistent with the PSR, the evidence presented at trial shows Defendant used numerous sophisticated means to carry out the fraud scheme. First, the scheme had a nationwide and international scope. Defendant, who based his operations in Mississippi, used a telemarketing call center in India to target beneficiaries located in jurisdictions throughout the country.[3] Gov. Exh. 6. The telemarketing call center, under Defendant's direction, used high pressure sales techniques and misrepresentations to trick elderly beneficiaries to provide their sensitive personal information. In some cases, they fabricated the recording altogether to make it seem like a Medicare beneficiary consented to braces when they had not. *E.g.*, Gov. Exhs. 507, 793. Defendant used fake contracts and invoices to conceal the fact that he and his co-conspirators were paying kickbacks in exchange for patient information and doctors' orders. *E.g.*, Day 4 Tr. at 91-92 (Frame); Day 3 Tr. at 81 (Chibnick), 139 (Parker). Defendant developed fake prescriptions specifically designed to allow telemedicine doctors to sign prescriptions in bulk and make the prescriptions appear legitimate to Medicare. *E.g.*, Day 2 Tr. at 173-74 (Laughlin), 193-94 (Richardson). Defendant set up straw companies with separate organizational documents and bank accounts and named his friends and family members as straw owners. *E.g.*, Day 3 Tr.

---

[3] This conduct is among the examples of sophisticated means described in the application note to the enhancement, which states that, "[i]n a telemarketing scheme, locating the main office scheme in one jurisdiction but locating soliciting operations in another jurisdiction ordinarily indicates sophisticated means." U.S.S.G. § 2B1.1(b)(10)(c) cmt. n.9(B).

at 24 (Wolfe); Day 4 Tr. at 11-13 (McKay); Gov. Exh. 43. Each of these are sophisticated means to execute and conceal an otherwise simple offense—billing Medicare for unnecessary DME—and satisfy U.S.S.G. § 2B1.1(b)(10)(C).

Contrary to Defendant's contention, the sophisticated means enhancement is not duplicative of the mass marketing enhancement that applies because of Defendant's use of call centers to target beneficiaries. Whereas the sophisticated means enhancement applies because Defendant conducted multi-jurisdictional and international operations, used sham invoices and contracts to conceal what would otherwise be facially illegal arrangements, and employed deceptive tactics to trick Medicare beneficiaries and Medicare auditors, the mass marketing enhancement applies because Defendant used telemarketing to *multiply* the number of Medicare beneficiaries targeted by the scheme. Just as Defendant used sophisticated means to execute what could have been a simple DME fraud scheme, Defendant separately chose to engage telemarketers to exponentially increase the scope of the fraud scheme. Both enhancements apply to his conduct. *See, e.g.*, *United States v. Davis*, 177 F. App'x 895, 899 (11th Cir. 2006) (rejecting an argument that a sophisticated means enhancement was duplicative of the more than minimal planning and mass marketing enhancements); *Moran*, 778 F.3d at 976–77 (applying both sophisticated means and mass marketing enhancements). Further, the Sentencing Guidelines contemplate both enhancements applying. One of the application notes for the sophisticated means enhancement specifically describes how a multi-jurisdictional telemarketing scheme will ordinarily implicate the sophisticated means enhancement. U.S.S.G.

§ 2B1.1(b)(10)(c) cmt. n.9(B).

### III.  THE APPLICATION OF THE § 3553(A) FACTORS IS CONSISTENT WITH THE GOVERNMENT'S RECOMMENDED SENTENCE.

The Government asks that the Court sentence Defendant to the statutory maximum sentence of each count of conviction but run those sentencings concurrently, resulting in a total sentence of 240-months in prison based on the 20-year maximum provided by the conspiracy to commit health care fraud and wire fraud charge (Count 2). Running Defendant's sentences concurrently has the practical effect of reducing Defendant's sentence by over 40-percent from the Sentencing Guidelines applicable to his crimes. Such a sentence would be "sufficient, but not greater than necessary," to satisfy the purposes of sentencing set forth in 18 U.S.C. § 3553(a).

### A.  The Nature and Circumstances of the Offense and the History and Characteristics of Defendant

Defendant and his co-conspirators tried to defraud Medicare and CHAMPVA out of an astounding amount of money—over $197 million. Defendant's scheme resulted in over $110 million in actual loss to the Medicare and CHAMPVA programs. The evidence presented at trial proved Defendant was at the center of each step of the operation. He profited by selling fake doctors' orders and billing Medicare for braces, typically for multiple braces at one time, that patients did not want, did not need, and did not use. *E.g.*, Gov. Exhs. 2-4. Defendant did not make a one-time mistake or omission. In addition to the tens of thousands of DME prescriptions Defendant sold to other DME companies, Defendant's own DME companies billed Medicare for sending *51,014* braces to *11,978* beneficiaries, including beneficiaries living in *every*

12

*state* in the country. Gov. Exhs. 1, 6. Defendant committed serious crimes, and a Guidelines sentence capped at Count 2's statutory maximum is appropriate.

A serious sentence commensurate with the Sentencing Guidelines is particularly appropriate here because, unlike some economic-crime defendants, Defendant did not start out with a legitimate operation only to find himself following others to bend the rules, suddenly in too deep to get back on track. His entire operation was built on fraud: buying and selling beneficiary information, generating fake doctors' orders, and buying and selling prescriptions. Co-conspirator after co-conspirator testified that throughout the scheme, Defendant was the one pushing for more patients, more prescriptions, and more braces. Defendant brought others into the fold, putting his fraudulent DME companies in their names and bringing those like Frame and McKay further into the scheme. The evidence presented at trial establishes Defendant was warned by multiple co-conspirators and indirectly by medical professionals, Medicare beneficiaries, and their family members, over and over, that his enterprise was sending senior citizens braces that they did not want or need and committing fraud. *E.g.*, Gov. Exh. 654, 676, 680, 684, 733, 743, 838.

Defendant argues that the Sentencing Guidelines are overstated because of the massive loss figure. Dkt. 184 at 10-11. However, even had the loss amount been limited to the amounts attributable to Defendant's own DME companies (which it was not), Defendant's Sentencing Guidelines range would have remained at 35 years of imprisonment based on an intended loss of over $35 million and the following calculations:

| Base Offense level (U.S.S.G. §§ 2S1.1(a)(1), 2B1.1(a)(1)) | 7 |
|---|---|
| Loss Amount (§ 2B1.1(b)(1)(L)) | +22 |
| Mass Marketing (§ 2B1.1(b)(2)(A)(ii)) | +2 |
| Federal Health Care Offense (§ 2B1.1(b)(7)(iii)) | +4 |
| Sophisticated Means (§ 2B1.1(b)(10)(C)) | +2 |
| 18 U.S.C. § 1957 (§ 2S1.1(b)(2)(A)) | +1 |
| Role in the Offense (§ 3B1.1.(a)) | +4 |
| Obstruction of Justice (§ 3C1.1) | +2 |
| **Total Offense Level** | **44** |

Defendant's Sentencing Guidelines range appropriately reflects the seriousness of his conduct and deep involvement in every aspect of this crime.

## B. Punishment, Promote Respect for the Law, and Afford Adequate Deterrence

The Sentencing Guidelines range applicable to Defendant's conduct provide appropriate punishment and specific deterrence for Defendant and his crimes, as well as adequate general deterrence.

Beginning with Defendant, a Guidelines sentence provides adequate punishment and specific deterrence for these serious, large-scale crimes and the efforts Defendant made to conceal his fraud throughout the scheme with sham contracts and invoices, fake doctors' orders, and straw owners. Despite his co-conspirators repeatedly warning him about the fraud, Defendant decided to continue growing the scope of his scheme by opening his own DME companies. He concealed his role in these companies and lied to Medicare. When he learned he was being investigated, Defendant attempted to hide the money, pay off co-conspirators, and directed another co-conspirator to destroy the evidence. Defendant also continued to engage in unlawful marketing after he knew that his DME scheme had been uncovered by law

14

enforcement. He shifted from braces to laboratory testing with some of the same co-conspirators after he learned of Operation Brace Yourself and his bank accounts were frozen. *See, e.g.*, Attached as Exh. C (emails between Defendant and individuals at a sham telemedicine company that received kickbacks from Defendant during the charged conspiracy discussing billing, orders, and kits sent to the laboratory).

A Guidelines sentence also provides adequate general deterrence for people engaged in or considering similar crimes. Health care fraud is rampant in the Middle District of Florida. Defendant and fraudsters like him steal taxpayer funds from Medicare and CHAMPVA—funds which should have been used to pay for medically necessary items and services for the blind, elderly, disabled, and the family members of disabled and deceased veterans. As the Eleventh Circuit has noted, "because economic and fraud-based crimes are more rational, cool and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence economic and fraud-based crimes." *United States v. Kuhlman*, 711 F.3d 1321, 1329 (11th Cir. 2013) (quotations and alterations omitted); *see also United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) ("Defendants in white collar crimes often calculate the financial gain and risk of loss, and white collar crime therefore can be affected and reduced with serious punishment."). A sentence of 240 months in prison promotes general deterrence for anyone considering stealing from government programs and provides just and fair punishment for those, like Defendant, who are convicted of eight-figure fraud schemes.

C.    Avoidance of Unwarranted Sentencing Disparities

A sentence of 240 months in prison also is consistent with the health care fraud sentences recently imposed in this District and in similar cases elsewhere in Florida. In this District, DME owners who caused substantially lower losses to federal health care programs have received significant sentences. Recently, in *United States v. Guiterrez*, No. 8:23-cr-279-VMC-LSG (M.D. Fla.), Lino Guiterrez received a 210-month sentence of imprisonment after being convicted at trial. Like Defendant, he worked with Kelly Wolfe to set up DME companies, purchased doctors' orders from Prizm Media and other companies, and used straw owners. *Guiterrez* Dkt. 1 at 1-3, 13-15. However, Guiterrez only owned two DME companies, was not the primary owner of either company, did not sell doctors' orders himself, did not direct a call center, did not pay sham telemedicine companies directly, was not charged with or convicted of money laundering, and only caused approximately $10.9 million in intended loss and approximately $5.1 million in actual loss to Medicare. *Guiterrez* Dkt. 1 at 2, 13-15.

In *United States v. Truglia*, Case No. 8:20-cr-0058 (M.D. Fla.), Patsy Truglia, a marketer, call center operator, and DME owner who pled guilty but did not receive a departure motion for cooperation, received a sentence of 180 months. His sentence stems from a similar scheme with an intended loss amount of approximately $37 million and an actual loss amount of approximately $18.3 million, a fraction of the loss amount here. Dkt. 116, 172.

In *United States v. Patel*, No. 9:19-cr-80181-RAR (S.D. Fla.), Minal Patel, a laboratory owner, engaged in conduct similar to Defendant's but in the genetic testing

16

space. He conspired with marketers, sham telemedicine companies, and call centers to target Medicare beneficiaries with telemarketing calls, used sham contracts, and paid kickbacks in exchange for doctors' orders. *Patel* Dkt. 527 at 1-6. His scheme had an intended loss of approximately $463 million and an actual loss of approximately $187 million; Patel profited approximately $21 million personally, less than Defendant did here. *Patel* Dkt. 527 at 1, 7. Patel received a sentence of 27 years of imprisonment— seven more years than sought by the Government in this case. *Patel* Dkt. 544.

In *United States v. Lloyd*, No. 25-80015-CR (S.D. Fla.), the president of an insurance brokerage firm and the CEO of a marketing company each received a 20-year sentence for an Affordable Care Act program scheme that used call centers. *Lloyd* Dkt. 252 at 3, 257, 258. The defendants were convicted at trial for some of the same charges as here: conspiracy to commit wire fraud, a violation of 18 U.S.C. § 371, and money laundering. *Lloyd* Dkt. 3, 257, 258. The scheme had an intended loss similar to here of approximately $233.2 million and an actual loss of $180.6 million, and the defendants also had an adjusted offense level of 43. *Lloyd* Dkt. 252 at 1. Like here, the scheme involved targeting vulnerable populations, using misleading call center scripts and deceptive sales techniques, and paying kickbacks. *Lloyd* Dkt. 3 at 9-10.

The cases cited by Defendant are distinguishable. Defendant primarily[4] relies

---

[4] Defendant includes Exhibit 13, a chart of certain cases involving unrelated defendants involved in similar schemes (Bruce Stroud, Bobbi Stroud, Kenric Griffin, Andrew Chmiel, Willie McNeal, IV, Neil John Aaron Williamsky, David Rae, Najib Jabbour), telemedicine doctors or nurse practitioners who signed orders as part of telemedicine schemes (Randy Swackhammer and Sherley Beaufils), and co-conspirators who pleaded guilty and cooperated (Kelly Wolfe, Jonathan Rouffe, Samuel Friedman, Schuler Poppe, Salma Karina Hayat,

on three comparator cases and attempts to distinguish one case in his sentencing memorandum to argue that Defendant's sentence should be reduced by over 65%. In *United States v. Cox*, No. 23-20271 (S.D. Fla.), Gary Cox was one of three individuals indicted as part of their roles as executives at HealthSplash, the company that ran DMERx, a technology platform was used to perpetrate the fraud. Dkt. 184, Exh. 15 at 2. Although Gary Cox had a leadership role and the technical knowledge to design DMERx, he was not the lead defendant. His co-conspirator Brett Blackman played that role. Blackman, who currently is being tried, is a more appropriate comparator to Defendant: he was the CEO of HealthSplash and the operator and owner of the other key entities involved in the fraud, including some that Cox had a limited role in. *United States v. Blackman*, No. 23-20271 (S.D. Fla.), Dkt. 76 at 8-9, 11-12. Importantly, Cox was 79 years old at the time of his sentencing, which was a key factor at his sentencing. Defendant does not have the same section 3553(a) considerations.

In *United States v. Hagen*, No. 3:19-cr-00146 (N.D. Tex.), *affirmed* 60 F.4th 932 (5th Cir. 2023), each defendant received a sentence initially at the top of the Sentencing Guidelines range, 151 months, which was then lowered because of the retroactive application of the zero-point offender reduction to the top of the newly applicable

---

Mitchell Chow, and Michelle Koehlinger). These are just a handful of the over 300 criminal cases that have been charged nationwide involving telemedicine and brace fraud over the past seven years, highlighting the importance of general deterrence in the space. The majority of the cases identified by Defendant involve individuals who accepted responsibility, pleaded guilty, and cooperated extensively. Most involve a substantially smaller intended and actual loss. For example, Najib Jabbour was a minority co-owner of a single DME company and caused only approximately $2.06 million in intended loss and approximately $1.09 million in actual loss—1% of the loss caused by Defendant.

Sentencing Guidelines range to 121 months. *Hagen* Dkt. 315, 318, 399, 401. The *Hagen* case involved the co-owners of two DME companies who placed both DME companies in their own names. *E.g.*, *Hagen*, 60 F.4th at 937; *Hagen* Dkt. 50 at 1. Not only was the Hagens' loss amount a fraction of Defendant's, but their conduct was limited to owning those DME companies and purchasing doctors' orders. *Id.* at 939 ("Between March 2016 and January 2019, the Hagens' companies billed Medicare Part B and Medicare Part C insurers almost $59,976,900. They were paid about $27 million, . . . ."). Defendant here directed the call center, sold over $162 million of doctors' orders, paid kickbacks to sham telemedicine companies, used straw owners to run eight DME companies, and was instrumental in a co-conspirator, Charlene Frame, opening a purported telemedicine company. Neither of the Hagens received a leadership enhancement. *See Hagen* Dkt. 399, 401 (retroactively applying a zero-point offender reduction, which could not have applied had the defendants received a leadership enhancement).

United States v. Baldonado, No. CR 21-430 (SDW) (D.N.J.), is inapposite. The defendant was a physician who was paid cash to sign orders for medically unnecessary genetic testing for residents of a retirement community who often were only seeking COVID-19 testing or did not have cancer and for medically unnecessary braces for a specific DME company. *Baldonado* Dkt. 61 at 9-10, 15-16, 21-22. Telemedicine was not a part of the conspiracy. The conspiracy did not have a nationwide or international scope. Baldonado did not have a leadership role. Baldonado only caused approximately $2.2 million in actual losses to Medicare. *Baldonado* Dkt. 128. For

19

example, Medicare paid Baldonado $6,400.38 for fraudulent office visits; and Medicare was billed approximately $5,900 and paid the DME company approximately $3,900 for the seven braces ordered by Baldonado. Attached as Exh. A at 58 (excerpt from day 1 of *United States v. Baldonado* trial); Attached as Exh. B at 30 (excerpt from day 2 of *United States v. Baldonado* trial). He received a sentence within the applicable Sentencing Guidelines range. *See, e.g.*, *Baldonado* Dkt. 126 at 1 (reflecting that the PSR calculated an offense level of 28, resulting in a Sentencing Guidelines range of 78-97 months); *Baldonado* Dkt. 128.

Finally, Defendant attempts to distinguish the case of Elizabeth Hernandez, a nurse practitioner who signed some of the doctors' orders billed by Defendant's DME companies and sold by Defendant. Dkt. 184 at 8-10 (discussing *United States v. Hernandez*, No. 1:22-cr-20152-KMM (S.D. Fla.)). Contrary to Defendant's assertions, *Hernandez* is an apt comparator to this case. Defendant and Hernandez each caused a similar amount of intended loss to Medicare. Hernandez caused approximately $192 million in intended loss, *Hernandez* Dkt. 179 at 1, and $111 million in actual loss, *Hernandez* Dkt. 180 at 5. Defendant caused approximately $197 million in intended loss and approximately $110 million in actual loss. While Hernandez's role was limited to one part of the process, signing doctors' orders, *Hernandez* Dkt. 3 at 10-12, Defendant was involved in each step of the scheme: buying Medicare beneficiary information, directing a telemarketing call center, paying the sham telemedicine companies, selling the doctors' orders, setting up and running DME companies, and billing Medicare. The amount Hernandez personally profited from the scheme,

approximately $1.6 million, is a fraction of Defendant's profit. *Compare Hernandez* Dkt. 178, *with* Gov. Exhs. 1, 44, 46, 48, 54.

Even if the Court were to focus on the five aspects of *Hernandez* that Defendant highlights, Defendant's case has almost all of the same elements. First, although Defendant may not have had a medical license, he was a leader and organizer of a vast fraud scheme. He owned two marketing companies and eight DME companies. Both Hernandez and Defendant billed Medicare. Defendant's eight DME companies were Medicare providers, trusted just like a nurse practitioner to bill the United States only for medically necessary claims, not to pay or receive kickbacks and bribes, and not to lie to Medicare. Defendants, like Hernandez, did all three.

Second, Defendant, like Hernandez, fabricated medical records. His operation was designed to create, sell, and bill false and fraudulent doctors' orders for multiple medically unnecessary braces. The jury saw the copy-and-paste doctors' orders that were designed to fool Medicare. *E.g.*, Day 2 Tr. at 157-58, 173-74 (Laughlin), 193-94 (Richardson); Gov. Exhs. 606A, 608A, 611A, 612A, 613A, 614A, 615A, 616A, 617A, 657A, 663A. Indeed, Defendant was billing Medicare for the very false orders that Hernandez was signing. *E.g.*, Gov. Exhs. 100, 102-05, 107-09.

Third and fourth, Defendant's conduct, like Hernandez, continued after Defendant learned about Operation Brace Yourself, involved obstructive conduct, and involved conduct intended to hide the fraud. The third count of the indictment, the money laundering conspiracy, occurred after Defendant learned that his bank accounts were being frozen. He learned that he was caught and moved money to avoid

it being frozen. After learning he was under investigation, Defendant also directed Sushil Singh to destroy evidence. Day 2 Tr. at 169 (Parker). Further, Defendant's emails reflect that he did not stop engaging in fraud. Rather than leaving the medical space, he shifted to laboratory testing. *See, e.g.*, Attached as Exh. C (emails discussing billing, test kits, and laboratories). During the conspiracy, Defendant used sham invoices, contracts, and doctors' orders to hide what he was doing from the Government. This is the same type of "multi-layered" conduct at issue in Hernandez.

Fifth, Defendant's conduct involved double-dipping. Defendant sold doctors' orders to his own DME companies for $250 per patient and then received 85% of the billings to Medicare, CHAMPVA, and other insurance companies on top of that per patient-payment. Day 4 Tr. at 12-13 (McKay). He was involved in multiple facets of the scheme as well—the operation of a call center, marketing companies, and DME companies.

Rather than being distinguishable from Defendant's conduct, Hernandez is appropriate comparator. Indeed, Defendant was more involved and profited more than Hernandez.

## IV.   RESTITUTION AWARD IS APPROPRIATE.

The Mandatory Victims Restitution Act of 1996 ("MVRA") requires courts to order defendants to pay full restitution to victims of an offense for specific federal crimes, including those involved here. 18 U.S.C. §§ 3663A(a)(1), (c)(1)(A)(ii). The MVRA requires that restitution be ordered "in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances

of the defendant." 18 U.S.C. § 3664(f)(1)(A); 18 U.S.C. 3663A(d) ("An order of restitution under this section shall be issued and enforced in accordance with section 3664."); *see also* 18 U.S.C. 3663A(b)(1)(A) and (B) (providing that "[t]he order of restitution shall require" the defendant to "return the property" or "pay an amount equal" to the value of the lost or destroyed property).

"'The touchstone of the constitutional inquiry under the Excessive Fines Clause is the principle of proportionality'; a fine is excessive 'if it is grossly disproportional to the gravity of a defendant's offense.'" *United States v. Reyes*, No. 21-11286, 2022 WL 4476660, at *2 (11th Cir. Sept. 27, 2022) (quoting *United States v. Bajakajian*, 524 U.S. 321, 334 (1998)). The Eleventh Circuit has held that even "[a]ssuming for argument's sake that restitution could be considered a 'fine'—that is, 'a payment to a sovereign as punishment for some offense,'" a defendant's "restitution was not 'excessive' and did not violate the Eighth Amendment" if the defendant "was ordered to pay only the amount of actual loss to the victims" because it is directly proportional to the defendant's offense. *Id.* (quoting *Bajakajian*, 524 U.S. at 327). Here, a restitution order of $110,753,619.63 is directly proportional to Defendant's offense—being the exact amount of actual loss he caused to Medicare and CHAMPVA, *see* Gov. Exhs. 1, 53, 54—and therefore does not violate the Eighth Amendment.

## V.   DEFENDANT'S RESTITUTION ORDER SHOULD BE JOINT AND SEVERAL WITH SOME OF HIS CO-CONSPIRATORS.

The Government agrees with Defendant that his restitution order is joint and several in part with several of his co-conspirators. For some but not all of his co-

conspirators, restitution judgements have been ordered that overlap with the Government and Probation's calculation of restitution in this case. However, the restitution awards of several of those identified by Defendant in his briefing do not overlap with the expected restitution order here. The Government will work with Defendant so that the parties can agree on and present to the Court these joint and several amounts at sentencing.

## VI.    THE COURT DOES NOT HAVE AUTHORITY TO ORDER THAT FORFEITURE APPLY TOWARDS RESTITUTION.

Defendant asks that the Court order that forfeited proceeds and property be credited against restitution. As the Eleventh Circuit has held, however, the Court does not have the authority to order such relief because "a district court generally has no authority to offset a defendant's restitution obligation by the value of forfeited property held by the government . . . ." *United States v. Joseph*, 743 F.3d 1350, 1354 (11th Cir. 2014) (collecting cases from other circuits). "[A] defendant is not entitled to offset the amount of restitution owed to a victim by the value of property forfeited to the government, or vice versa, because restitution and forfeiture serve distinct purposes." *Id.* (citing *United States v. Bane,* 720 F.3d 818, 827 n. 8 (11th Cir. 2013); *United States v. Hoffman–Vaile,* 568 F.3d 1335, 1344 (11th Cir. 2009)). This is because "[w]hile restitution seeks to make victims whole by reimbursing them for their losses, forfeiture is meant to punish the defendant by transferring his ill-gotten gains to the United States Department of Justice (DOJ)." *Id.* at 1354–55 (citations omitted). As discussed above, the MVRA, by its text, requires the district court to order restitution in the full amount

24

of a victim's losses. Accordingly, the Eleventh Circuit reasoned that "it would be nonsensical for the district court to have discretion to reduce the amount of restitution by the value of property seized from the defendant and retained by the government in [ ] forfeiture." *Id.* at 1355 (citation and quotations omitted).

In the same decision, the Eleventh Circuit held that 18 U.S.C. § 3664(j)(2), the authority cited by Defendant, does ***not*** permit a district court to order the relief Defendant seeks. First, that section only applies to compensatory damages recovered by a victim in a civil proceeding after the district court orders restitution. *Joseph*, 743 F.3d at 1355 (citation omitted). Second, the law gives the Attorney General sole discretion to determine whether forfeited money or property should be applied to restitution owed to the victims of an offense. *Id.* (citing 18 U.S.C. §§ 981(d), (e)). Accordingly, Defendant's request to apply forfeited proceeds and property to the restitution ordered must be denied.

## VII.  <u>CONCLUSION</u>

For the reasons set forth above, the Court should impose the statutory maximum sentence for each count of conviction, run concurrently, to result in a total sentence of 240 months of imprisonment, together with the restitution and forfeiture recommended in the PSR.

Respectfully submitted,

GREGORY W. KEHOE
UNITED STATES ATTORNEY

LORINDA LORYEA
CHIEF, FRAUD SECTION
CRIMINAL DIVISION
U.S. DEPARTMENT OF JUSTICE

By:    */s/ Catherine Wagner*
Catherine Wagner
Acting Assistant Chief
Florida Special Bar No. A5502410
William Hochul III
Trial Attorney
U.S. Department of Justice
Criminal Division, Fraud Section
1400 New York Ave. NW
Washington, D.C. 20005
Telephone: (202) 794-0097
Email: Catherine.Wagner@usdoj.gov
Telephone: (202) 538-4256
Email: William.Hochul.III@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on May 4, 2026, I electronically filed the foregoing with the

Clerk of Court (CM/ECF).

By:    */s/ Catherine Wagner*
Catherine Wagner

26